JOSEPH C. SMITH, Plaintiff-Appellee, *v.* THE COUNTY BOARD OF MADISON COUNTY *et al.*, Defendants-Appellants.—(JAMES R. HEIL *et al.*, Defendants.)

Fifth District   No. 79-530

Opinion filed July 28, 1980.

Nicholas G. Byron, State's Attorney, of Edwardsville (Al J. Pranaitis, Special Assistant State's Attorney, of counsel), for appellants.

Ronald C. Mottaz, of Thomas, Mottaz & Eastman, of Alton, for appellee.

Mme JUSTICE SPOMER delivered the opinion of the court:

Defendants, County Board of Madison County (County Board), Madison County Zoning Board of Appeals (Zoning Board), and Jack R. Clifford, secretary, appeal from a declaratory judgment of the circuit court finding the county's zoning ordinance unconstitutional and void as applied to a 40-acre parcel of land in Godfrey Township. Plaintiff Joseph C. Smith has filed a cross-appeal from that portion of the judgment order which provided for a rehearing or a new hearing by the County Board. Four issues are raised: (1) whether plaintiff lacked standing to attack the constitutionality of the zoning ordinance; (2) whether the trial court erred in basing its decision on the recommendation of the Zoning Board and the subsequent hearing before the County Board; (3) whether plaintiff proved by clear and convincing evidence that the zoning ordinance is void as applied to his property; and (4) whether the court erred in excluding certain evidence at trial.

The subject 40-acre tract was one of three parcels of land totalling 160 acres which were the subject of a contract dated December 28, 1965, between sellers Benjamin and Ethel Dresler and buyers Joseph C. and

Laverne Smith. This contract granted buyers a continuing option to purchase the tracts so long as they paid 5 percent interest semiannually on the outstanding purchase price. The total purchase price was $48,000, with the three tracts valued at $250 to $700 per acre. Upon execution of the contract, buyers agreed to pay sellers $200, $100 of which was to be credited against the purchase price. In addition, upon reclassification of the property for subdivision purposes, buyers agreed to pay sellers an additional sum of not less than $3,900. Property taxes for the year 1966 and for all subsequent years were to be paid by the buyers, and beginning in 1966, they had the right to farm all three tracts.

At the time of trial in 1978, plaintiff testified that he had made all interest payments on the option contract, and that the contract was current and up-to-date. In addition, he had paid taxes and liability insurance on the entire 160 acres and between $12,000 and $13,000 on the total purchase price, which sums were not earmarked toward the purchase of any one specific tract. In return for the portion of the sales price he paid, he received no comparable amount of property or deeds. Rather, the parties apparently considered the buyers equitable owners of the three tracts to the extent of the payments made.

When the contract was executed, the land was zoned agricultural. In 1966 one of the three tracts was rezoned to R-3 classification, permitting development of single-family residences. Approximately 50 acres were developed into a subdivision known as Piasa Hills, consisting of slightly more than 100 homes. During development of the subdivision, the 40-acre tract which is the subject of this appeal, situated immediately east of Piasa Hills, was used by plaintiff for storage. It was described as a "marginal" parcel of ground and is fully wooded, rough terrain with ridges, hills and valleys throughout. The land to the north, east, and south is unimproved and is zoned agricultural.

In 1974 plaintiff applied for a rezoning of this property to R-5, multiple-family dwelling residential classification which would permit him to develop condominiums on the tract. Following a hearing, the Zoning Board recommended that his application be approved. However, the County Board, then known as the Board of Supervisors, denied the application.

Plaintiff filed a complaint in the circuit court seeking administrative review of the decision of the County Board. Subsequently, in January 1975, an amended complaint was filed, seeking a declaratory judgment.

A two-day trial was ultimately held, with the first day in November 1977, and the second day approximately one year later. On the first day, count I of the complaint requesting administrative review was dismissed with prejudice at plaintiff's request, and trial was called on count II for declaratory relief. Paul T. Hawkins, building and zoning environmental

administrator for Madison County, testified on behalf of plaintiff that the Zoning Board had reviewed the engineer's plans and drawings for the condominiums proposed, and recommended the zoning revision to the County Board. Zoning went into effect in 1963 based upon the use of property at that time and had since been a series of revisions, amendments, and special uses and variations. Hawkins named other established subdivisions in Madison County that have only one entrance and exit—as is planned for the subject property—which is one of defendants' objections to plaintiff's proposed development. He stated that if a tract is rezoned R-5, a building permit will not be issued for that property until the requirements of the Building and Zoning Environmental Agency of the county are met.

Phillip M. Corlew, a consulting engineer and land surveyor who also served on the Edwardsville Zoning Board, testified that because of the topography of the land, it has little value as farmland and is unsuitable and unprofitable for development of single-family homes. Because of the rough terrain, any construction should stay close to the ridge tops, and a great deal of the land should remain vacant. Therefore, the multiple-family buildings will aid in preserving the land and will be more profitable. A relatively small portion of the site, compared to the total acreage, would be developed, and these undeveloped areas would also serve to "buffer" the condominiums from the Piasa Hills subdivision. He asserted that construction of a second entrance to the property, apart from Piasa Hills, would be impractical because of the steepness of the hills. On cross-examination, he admitted that the heavy equipment used in construction would have a detrimental effect on the streets in Piasa Hills. In his opinion, drainage laws and requirements of the Environmental Protection Agency would ensure an adequate solution to the problem of sewage and surface run-off, and it would be possible and feasible to install a sewage treatment system to cover this development that meets all standards. As a member of the Zoning Board, he would be concerned about the impact of run-off water in allowing or disallowing a proposed rezoning. However, he did not foresee any erosion problems to adjoining landowners' land because of this development.

At the second day of trial, November 22, 1978, George Peterie, a real estate broker, testified for the plaintiff. He estimated that in 1974 the subject parcel was worth about $1,000 to $1,500 an acre as farmland, while its present value is $4,000 to $5,000 if rezoned R-5. He testified that condominiums would have no effect on property values in Piasa Hills and would enhance the value of the surrounding farmland. There would be less traffic if the land were used for condominiums rather than single-family homes, as generally there are about two persons per condominium unit and 3.75 per single-family residence. He testified that condominiums

in Arrow-Wood Subdivision are within 50 yards of residential homes, and that there have been no condominiums constructed in Godfrey Township.

Plaintiff testified regarding his purchase of the 160 acres and his attempts to have the property rezoned. He asserted that he had developed and built more than 1,000 homes in the Madison County area, and that specific road and sewage plans were neither required nor practical prior to actual rezoning. However, an engineering firm had studied various sewage systems which would be feasible on this tract and would meet county and EPA regulations. He also testified that the 125 condominiums, including roads and parking, would use only 33 percent of the land-surface area of the tract. He stated that he used this 40-acre tract for storage while building Piasa Hills; that he has maintained the property and paid taxes and insurance on it since 1966. He has made all the required payments on the contract to date, amounting to $12,000 or $13,000. The land is not suitable for farming. He stated that there are three or four subdivisions in the area having only one means of ingress and egress to the highway. In his opinion, the assessed value of the forty acres, after the proposed improvements, would be $3,000,000.

Jerome Besterfeldt testified on behalf of defendants that he had lived in Piasa Hills for 10 or 11 years. His home was on the street through which automobiles would enter and leave the proposed condominiums, and the increased traffic past his home was his primary objection to the development. In addition, Besterfeldt noted that an R-5 zoning classification provided no guarantee of condominium development but would permit other types of multiple-family dwellings. He was opposed to the building of apartments on the property. He testified that he had personal animosity toward the plaintiff.

Wayne Croxford testified that he lived directly north of Piasa Hills and owned the property north of the proposed new development. He based his objection to the new development on drainage problems, and presented a number of photographs showing drainage ditches and pipes crossing his property north of Piasa Hills. Croxford stated that no drainage or erosion problems had arisen until development of Piasa Hills, and he feared that similar problems would develop on his property north of the proposed development. He also testified that the property could be used for raising livestock or for orchards. During cross-examination, he revealed that he had personal animosity toward plaintiff; he had sued plaintiff for erosion problems on his land and had settled the case for $500.

Harold Schulte testified that he owned land bordering the site of the proposed development for one-quarter mile on the south and one-quarter mile on the east. His major concern regarding the project was effluent from the sewer system of the condominiums flowing over his

property, causing serious erosion. He stated that the land could be used as pasture for livestock, if fenced, but was not good for farming.

Defendants' first contention on appeal is that plaintiff, having merely an option to purchase the subject property, lacks standing to attack the constitutionality of the zoning ordinance. They assert that plaintiff does not own nor have a possessory interest in the land entitling him to use the premises in a manner interfered with by enforcement of the ordinance, citing *Clark Oil & Refining Corp. v. City of Evanston* (1961), 23 Ill. 2d 48, 177 N.E.2d 191. That such an interest is necessary is unquestioned and the reasons for the rule are discussed in *Solomon v. City of Evanston* (1975), 29 Ill. App. 3d 782, 331 N.E.2d 380, 385:

> "As the court in *Clark* noted, there is a definite reason why a party attacking a zoning ordinance must show greater standing than merely a contract to purchase. The reason is that a party attacking a zoning ordinance must show that the restraint imposed by the ordinance on his right to use his property bears no substantial relation to the public health, safety, and welfare. But where a party merely has a contract to purchase, he can make no such showing of restraint because he has no right to use the property in any manner. His only right, to purchase the property, remains unchanged regardless of the validity or invalidity of the zoning ordinance."

We do not disagree with defendants that *Clark* is controlling where the plaintiff has an option to purchase and nothing more. However, we believe that plaintiff's actions taken pursuant to the option contract created a bilateral agreement, binding him and giving him an equitable interest in the property. An option to purchase real estate becomes bilateral and enforceable at the instance of either party where the party holding the option signifies his acceptance within the time limited and on the terms stated (*Macy v. Brown* (1927), 326 Ill. 556, 158 N.E. 216), and this is true although no tender of the purchase price is made and conveyance of the property is not executed (1A Corbin on Contracts 514-15 (1963); see also *Welsh v. Jakstas* (1948), 401 Ill. 288, 82 N.E.2d 53, 59, where notice of acceptance created a bilateral contract despite lack of payment, even though the option contract provided that "upon the exercise of the option to purchase the lessees shall immediately pay $12,000 in cash").

■■ We believe that plaintiff took sufficient steps under the option contract to evidence his agreement to purchase the property *in toto*. Upon execution of the contract, plaintiff paid the sellers $200, $100 of which was credited against the purchase price. When the Piasa Hills property was rezoned R-3 for single-family residences, plaintiff made a payment of $3,900 against the purchase price. From the year 1966 on, plaintiff paid all

of the taxes and insurance on all three of the parcels of land, and he had the right to utilize the land for construction purposes, farming, and storage. He developed Piasa Hills subdivision, and apparently resold lots to the individual Piasa Hills homeowners. Furthermore, the $12,000 or $13,000 in payments which plaintiff had made against the purchase price was not earmarked toward the purchase of any one of the parcels, but was apparently credited against the undifferentiated whole. It also appeared that the parties to the contract considered it to be bilateral, with each party bound to the entire transaction. Whatever the technicalities between the buyer and seller in this case, we believe that the plaintiff's position is sufficiently distinguishable from that of the plaintiff in *Clark* to support the trial court's conclusion that plaintiff had equitable ownership of, and a possessory interest in, the land; that the sales contract was not contingent upon rezoning; and that the contract was partially executed and subject to specific performance. Accordingly, plaintiff has standing to challenge the zoning ordinance as it applies to this land.

At the beginning of the trial in 1977, plaintiff dismissed with prejudice count I seeking administrative review of the County Board's decision. However, the trial court's order contained a finding that plaintiff had "failed to meet his burden of proof" under that count. Pursuant to count II for declaratory judgment, the court ordered the County Board to hold a new hearing or in the alternative to review the record of the Zoning Board, and in default of either, enjoined the defendants "from interfering with plaintiff in the development and use of the subject real estate under the R-5 multiple-family residential use classification." Defendants contend that the hearings before the boards are not subject to review where declaratory judgment is sought and that the trial court's attempt to order the County Board to hold a second hearing was improper. Plaintiff agrees, and his cross-appeal rests on this issue. However, plaintiff contends that such portion of the order was mere surplusage and had no effect on the trial court's proper ruling granting declaratory relief. We agree.

■■ It is readily apparent that administrative review of the actions of the Boards was not a remedy available to plaintiff. The actions of both the County Board and the Zoning Board were legislative in nature. Zoning ordinances are enacted under legislative authority to provide for the public health, safety, and welfare. (*Anthony v. City of Kewanee* (1967), 79 Ill. App. 2d 243, 247, 223 N.E.2d 738, 740.) Because of separation of powers, the courts are generally without power to inquire into the wisdom of an ordinance or the motives which prompted its enactment. (*Anthony*, 79 Ill. App. 2d 243, 247, 223 N.E.2d 738, 740.) Thus, the failure of a legislative agency, whether city or county, to allow an amendment to its zoning ordinance is a legislative determination and is not to be

reviewed upon the record. *Meyer v. County of Madison* (1972), 7 Ill. App. 3d 289, 291, 287 N.E.2d 159, 161.

It is only where the legislative body transfers to some administrative agency the authority to administer the ordinance that administrative review by the courts is applicable. (*Fitzpatrick v. City of Springfield* (1973), 10 Ill. App. 3d 317, 321-22, 293 N.E.2d 712, 716.) Where zoning action is taken by the legislative body and not an administrative body, a declaratory judgment action is the appropriate remedy. (*Fitzpatrick*, 10 Ill. App. 3d 317, 322, 293 N.E.2d 712, 716.) In such action the validity of the ordinance does not depend on the evidence presented at the hearings before the Zoning Board or the County Board, but is determined in an independent action. Therefore, transcripts of the hearings are not to be introduced into evidence, as that would deprive the defendants of their right to have primary or direct evidence presented in open court for assessment and evaluation by the court. *Anthony*, 79 Ill. App. 2d 243, 249, 223 N.E.2d 738, 741.

■■ We are not convinced, however, that this attempt to tamper with the legislative process had any significant deleterious effect · upon the declaratory judgment. The trial court was understandably uncertain as to the precise nature of the relief sought in November 1978, the second day of trial, as a full year had elapsed since the first day of trial. However, counsel quickly recounted the nature of the hearing. From that point on, the hearing proceeded for declaratory judgment. The testimony of all the witnesses was directed toward the propriety of the zoning ordinance as it affected plaintiff's property, and only rarely were the procedures of the defendant boards mentioned. Furthermore, while the minutes of the County Board meeting were entered into evidence by stipulation, transcripts of the hearings of the boards were not considered. Accordingly, defendants were not deprived of their right to "have primary or direct evidence presented in open court for assessment and evaluation by the court." *Anthony*, 79 Ill. App. 2d 243, 249, 223 N.E.2d 738, 741.

The supreme court has delineated the issue presented in a case for declaratory relief:

"[T]he issue is not whether the Board of Appeals or Board of Trustees of the Village erred or abused their discretion but whether the restriction as applied to Plaintiff's property is arbitrary, unreasonable, and without substantial relation to the public health, safety, comfort, morals and general welfare." (*Stemwedel v. Village of Kenilworth* (1958), 14 Ill. 2d 470, 474, 153 N.E.2d 79, 81.)

We believe that this issue was thoroughly considered in the instant case. Further, the evidence presented was sufficient to support the trial court's

order granting declaratory judgment for the plaintiff; thus the court's limited consideration of the procedures followed by the County Board was, at most, harmless error.

Defendants further argue that plaintiff failed to meet its burden of showing the invalidity of the ordinance. The law is well settled that the ordinance is presumed valid, and a party attacking it has the burden of overcoming this presumption with clear and convincing evidence that the ordinance, as applied to the property in question, is arbitrary and unreasonable, and has no substantial relation to the public health, safety, morals or welfare. (*Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 820, 387 N.E.2d 745, 747.) The factors to be considered in making such a determination include (1) the existing uses and zoning of nearby property; (2) the reduction in property value resulting from the particular zoning restriction; (3) the extent to which the destruction of property values of the site promotes the general health, safety and welfare of the public; (4) the relative gain to the public as opposed to the hardship to the owner; (5) the suitability of the property for the zoned purpose; and (6) the length of time the property has remained vacant, as zoned, in the context of other land development in the area. (*LaSalle National Bank v. Village of Harwood Heights* (1971), 2 Ill. App. 3d 1040, 1045-46, 278 N.E.2d 114, 117-18.) Added to these factors are intangible factors, such as the care with which the legislative body planned its land-use development and the community need for the use proposed by the property owner. *Locker v. City of McHenry* (1967), 89 Ill. App. 2d 457, 460, 231 N.E.2d 685, 688.

As the court said in *LaSalle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 47, 145 N.E.2d 65, 69, "No one factor is controlling. It is not the mere loss in value alone that is significant, but the fact that the public welfare does not require the restriction and resulting loss." Where the gain to the public is small from a continuation of present restrictions, as opposed to the hardship to the owner of the subject property, and the evidence shows that the values of surrounding properties will not be seriously affected by the proposed use, the courts are especially justified in declaring the ordinance unreasonable, confiscatory and void. *Myers v. City of Elmhurst* (1958), 12 Ill. 2d 537, 147 N.E.2d 300.

Where the testimony before the lower court in a bench trial, as here, is contradictory, the weight to be given testimony is a matter for the trial court, and the court's judgment will not be disturbed unless manifestly against the weight of the evidence. *First National Bank v. Village of Morton Grove* (1973), 12 Ill. App. 3d 589, 594, 299 N.E.2d 570, 575.

In light of the relevant factors, we believe that the trial court's finding that the refusal to rezone plaintiff's property was arbitrary and

unreasonable was not against the manifest weight of the evidence. The evidence revealed that plaintiff's property was valued at $1,000 to $1,500 per acre when zoned agricultural, while a rezoning would increase the value to $5,000 per acre. Evidence also supported the conclusion that the value of the adjoining properties would also be increased. Furthermore, the subject property was unsuited for virtually any purpose while zoned agricultural. The land could not be tilled, because of its terrain. The wooded, hilly terrain also made it unsuitable for subdivision into one-acre lots, which would have been possible under the agricultural classification. Because of the proximity of Piasa Hills, the tract was unsuited as pastureland. While part of the property may have at one time been used for a fruit orchard, the lot had not been used for any agricultural purpose for many years. In fact, the evidence indicated that the property is uniquely suited for condominium development, and ill-suited for any other use, since condominiums would occupy only one-third of the surface area of the tract, thereby maintaining the natural terrain and ground cover of the rest of the property.

The factors which the County Board cites as tending to support denial of the petition to rezone lack persuasive value when considered in the context of this case. Land abutting the subject property on three sides is zoned agricultural, but the majority of this land was not, and could not be, used for farming. Further, the agricultural zoning of the area was not done as part of a comprehensive plan by the County Board, but was zoned in conformity with its use in 1963. The 1963 zoning ordinance had been subject to numerous amendments and special use variances in the interim. Thus, the agricultural classification had no particular or direct relationship to the public health, safety or welfare. Moreover, the numerous amendments to the ordinance, including that which permitted the development of Piasa Hills on the adjoining parcel, belie the Board's claim that rezoning "would constitute an unwarranted intrusion into an established and stable area." *Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 569, 386 N.E.2d 309, 315.

In addition, the specific complaints which witnesses for the County Board expressed, and which constituted the only threats to the public health, safety and welfare, are capable of being resolved through measures much less drastic than complete denial of rezoning. The chief concern was the problem of sewage and surface water run-off, which opponents feared would result in erosion of the area. However, testimony indicated that these matters would be subject to approval by the county as well as the Environmental Protection Agency prior to issuance of a building permit, and that restrictions are particularly stringent when applied to multiple-family dwellings. A second concern

was the increased traffic which would result in Piasa Hills. However, it appears that development of the subject tract was anticipated when Piasa Hills was developed, to the extent that roads and electricity were extended to the edge of the property. Added traffic controls would also be possible. The fact that only one-third of the 40-acre property would be developed also serves to alleviate the seriousness of both problems.

Finally, plaintiff established that there was a significant need, and appreciable demand, for condominiums in Madison County. All evidence indicated that condominiums would not decrease the value of the homes in Piasa Hills. When all these factors are considered, the conclusion that the zoning ordinance was arbitrary and unreasonable as applied here is not against the manifest weight of the evidence.

The County Board's final contention is that the court erred in excluding certain evidence from trial. During cross-examination of the plaintiff, counsel asked him whether he had looked for other property on which to build condominiums. Plaintiff's counsel objected on grounds that the question was not material, and the objection was sustained. The County Board now reminds us that a relevant concern in zoning cases is whether the ordinance totally excludes certain uses or whether such uses are provided for elsewhere. (*Camboni's, Inc. v. Du Page County* (1962), 26 Ill. 2d 427, 187 N.E.2d 212.) However, the evidence showed that the zoning ordinance was not part of a comprehensive plan of land use. Furthermore, the question was not limited to Madison County or to the area of Godfrey Township where the land is situated. Zoning maps admitted into evidence established that there is no property zoned for condominiums within five or six miles of plaintiff's property. Thus, exclusion of the evidence was not error.

Defendants also argue that the court erred in excluding evidence regarding particulars of the hearing held by the County Board. As we have already noted, however, this is not a case of administrative review, but one of declaratory judgment, and such evidence was properly excluded.

Finally, the court's refusal to admit a petition against the condominium, signed by some of the residents of Piasa Hills, was proper. Harold Schulte, who prepared the petition, was unable to assert the accuracy of the names on the petition, and those who signed were not subject to cross-examination. At any rate, we are convinced that the trial court's rulings on evidentiary matters had no effect on the outcome of the litigation.

For the foregoing reasons, we reverse that part of the trial court's order directing the County Board to hold a rehearing or a new hearing, and we affirm the declaratory judgment of the trial court finding the

Madison County Zoning Ordinance unconstitutional and void as applied to the plaintiff's property.

Reversed in part, affirmed in part.

JONES, P. J., and KARNS, J., concur.