EDGEMONT BANK AND TRUST COMPANY *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF BELLEVILLE *et al.*, Defendants-Appellants.

Fifth District   No. 79-278

Opinion filed June 27, 1980.

Weihl & Millard, Ltd., of Belleville (Donald E. Weihl, of counsel), for appellant Charles F. Ahrens.

Robert J. Sprague, of Sprague, Sprague & Ysursa, of Belleville, for appellant City of Belleville.

William D. Stiehl, of Stiehl & Hess, and Sam S. Pessin, of Pessin, Baird & Wells, both of Belleville, for appellees.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

At issue here is the propriety of a zoning classification for certain property located in the city of Belleville, a defendant herein. The plaintiff, Edgemont Bank and Trust Company, now known as Mid America Bank and Trust Company of Edgemont (hereinafter referred to as the Bank), filed an action in the trial court seeking declaratory and injunctive relief. The trial court declared the zoning classification unconstitutional and void as applied to plaintiff's property and enjoined the defendant city from preventing plaintiff's development and use of the property as a walk-up banking facility. Defendants, 21 homeowner intervenors and the city of Belleville, appeal. Defendants contend initially that they are entitled to reversal as a matter of law because the trial court placed on them, rather than on the plaintiff, the burden of proving the validity of the zoning ordinance. Alternatively they contend that the plaintiff failed to meet its burden of proof. Other issues defendants raise relate to the trial testimony of certain witnesses.

Plaintiff purchased its property on December 15, 1977, from Howard and Lela Moore for $125,000. At the time of purchase the property was zoned C1, Light Commercial, which permits specified kinds of business

but does not include any kind of banking activity. The zoning classification C2, Heavy Commercial, permits "banks." Two months prior to the purchase, at a public hearing held on October 17, 1977, the city council of Belleville denied the Moores' motion to rezone the premises whereby they would have been reclassified from C1 to C2, that is, from Light to Heavy Commercial. At that meeting of the city council petitions were presented bearing 309 signatures of residents of the area objecting to the reclassification. Also presented was a "Written Protest of Adjoining Owners" bearing seven signatures. On December 21, 1977, the Bank filed the instant suit. On February 14, 1979, a three-day bench trial commenced.

The zoning ordinance, whose amendment the Moores sought, was passed in 1965 and provides as follows with respect to C1 and C2 Commercial Districts:

"A. C1 LIGHT COMMERCIAL DISTRICTS:
The following buildings and uses are permitted in a Light Commercial District:
1. All uses permitted and as regulated in a Multi-Family District.
2. Offices as follows: That of doctor, dentist, insurance sales, real estate sales, engineering, law, tax consultants, and accountant.
3. Funeral Home or Mortuary.
B. C2 HEAVY COMMERCIAL DISTRICTS:
The following buildings and uses are permitted in a Heavy Commercial District:
* * *
8. Business offices of all types including office buildings, banks, business colleges and private trade schools."

As evidence of the unreasonableness and arbitrariness of the scheme of classification, plaintiff introduced at trial the number and kinds of businesses that have developed along the four-lane highway that bounds the property in question, together with photographs of many of these commercial establishments and testimony as to their location along this highway.

Unfortunately, though the record does contain maps of the entire city of Belleville, it does not contain any detailed map of the area with which we are primarily concerned, the area around plaintiff's property. The record often displays minor inconsistencies and is at times confusing. Nevertheless, we have ascertained from all the evidence that plaintiff's property is located at the northeast corner of a four-block area which, by itself, is densely single-family residential in character. However, that four-block area, including plaintiff's property, is bounded on the north by West Main Street, the principal artery linking the cities of Belleville and East St.

Louis, a heavily traveled east-west thoroughfare. In a westerly progression away from the center of the city of Belleville during approximately the past 20 years, commercial development has occurred in various degrees of intensity along the entire length of this thoroughfare. It has, however, largely skipped this four-block section. Throughout trial defendants sought to limit the area for consideration more nearly to this four-block section and objected to plaintiff's introduction of evidence relating to essentially all of West Main Street west of 46th Street, a span of about 60 blocks.

Bounding the four-block area on the east is 78th Street, which intersects with West Main Street to form the corner where the Bank wishes to install its walk-in facility. Directly across 78th Street to the east from plaintiff's property is a gas station fronting on West Main Street. Adjacent to the gas station on the east is a tavern. Both establishments have been operated in those locations for approximately 20 years or more and, as C2 uses, constitute nonconforming uses under the zoning code adopted in 1965. Likewise, the four-block area itself, located toward the western end of the artery and comprised of the 7800, 7900, 8000 and 8100 blocks, has remained essentially unchanged for over 20 years.

On the south side of West Main Street the residential area extends undisturbed by commerce for approximately six more blocks. However, that is not the case on the north side of West Main Street. In the 8100 block on the north side of the street is a rather small grocery store, operated at that same location for well over 20 years. North of West Main Street in the 8200 block, across 82d Street from the grocery store and just west of the four-block area, are a dry cleaning establishment and a beauty shop. A religious education office is adjacent to them on the west. About two blocks further west on the north side of the street is a funeral home. Proceeding west, one finds in the next two to three blocks on that same side of the street an insurance and a real estate office and a large, modern complex known as the Kilmar building, which houses, in two stories, doctors' offices and a drugstore and provides patients and patrons ample parking space. At approximately this point on the south side of West Main Street commercial establishments reappear. The first such establishment, a bridal shop, is approximately 10 blocks west of the gas station and tavern that lie just to the east of plaintiff's property and the four-block area.

In the four-block area itself on the south side of West Main Street, plaintiff's property is the only nonresidential property other than a church, which is located at the northwest corner of the four-block section, in the 8100 block across the street from the grocery store. After the Moores bought the subject property, they opened a nursery school in 1956 on the first floor and lived upstairs. Prior to plaintiff's purchase of the property,

the three buildings comprising it at 7800, 7810 and 7812 West Main Street were used for offices and apartments. At trial it was shown that the building at 7800 housed the Heidemann Insurance Agency and contained one apartment. That at 7810 contained two to three apartments while that at 7812 served as the location for offices used by the Children and Family Advocacy Council and related mental health agencies. There are parking lots in front of at least two of these buildings. On the north side of West Main Street, opposite the four-block area, in addition to the grocery store, the only other nonresidential property seems to be a beauty shop, a nonconforming use, which is unmarked by any sign and is operated within a residence across the street from plaintiff's property. The record, however, is particularly unclear with regard to the beauty shop.

East of the four-block area there is commercial property on both sides of West Main Street. On the north side of West Main Street in the 7700 block—across the street from the gas station and just east of the four-block area—is a florist shop, another nonconforming use. Adjacent to the florist shop on the east is what appears from a photograph to be a large, modern, single-story mortuary. East of the mortuary is an "office complex" of—and here the record is again unclear—one or two buildings, one of which, as may be seen by a photograph, contains two stories. The complex is used by doctors, lawyers, and the East St. Louis Stone Company, among others.

Of the numerous commercial establishments and service facilities located further east along both sides of West Main Street and discussed at trial, we mention only the most noteworthy. In approximately the 7000 block is a Shopland grocery store. In the 6500 block is the Arcades, a modern shopping center containing numerous retail establishments, including a liquor store. In the 6400 block is the Notre Dame Surgical and Medical complex which includes a medical office building, a surgical center and a nursing home. Adjacent to the medical complex, in the same block is the Bankers Trust drive-in banking facility. In the 6100 block is another banking facility, a branch office of the Illini Federal Savings and Loan Association. In the 5100 block is the Midwest Home Savings and Loan Association building, and in the 4800 block the Bank of Belleville. Of the four banking institutions, Bankers Trust is the most westerly. There are no banking facilities between Bankers Trust and 9500 West Main Street.

Plaintiff proposes to raze two of the buildings on its property and to incorporate the third into a single-story brick building of colonial design with a white portico and two white columns, much like the Illini Federal Savings and Loan Association building in appearance. The building is to be set far enough back from the street that it will not obstruct the view of motorists. The Bank expressed a willingness to provide more buffer

landscaping and to permit the school bus, which stops in the area, to load and unload in its proposed parking lot. The walk-in facility would be only an ancillary banking facility for the limited purpose of making deposits, loan payments and withdrawals. Since the facility would not be a branch bank, customers would be unable to take out loans or transact trust business. An estimated 250 automobiles a day would use the facility, and an estimated 50 persons would arrive on foot. The architect testified that the facility would place no additional burden on traffic as it already exists on West Main Street. He testified further that the walk-in facility could not be converted practically into a drive-in facility. He stated that the Bank's present property is too small to be efficient as a drive-in facility and that even if the Bank were to acquire certain additional adjacent property to permit the design of an efficient drive-in facility, the problem of "back-up parking," that is, the problem of customers having to wait in line, would exist.

A real estate broker and appraiser testified for plaintiff as to a continuing trend with respect to the uses of property along West Main Street. He stated that "the trend has been from residential to more commercial uses as time goes on, both east and west of 46th Street." He predicted that the trend would continue in the future. In his opinion the best and highest use of the subject property would be a C2 zoning, and placement and use of the walk-in banking facility, as proposed, "would not affect the neighborhood adversely. In fact, it might even help it as far as character and looks." He testified that he did not know whether the proposed facility would appreciate the value of residential properties on the south side of West Main street to the west of the subject property but that he was "sure it wouldn't depreciate them." However, in his opinion the use of the facility by 250 automobiles daily would cause additional traffic congestion in the area.

A land use planner testified extensively and persuasively for plaintiff. With respect to the character of that portion of the city of Belleville on West Main Street between 46th and 105th Streets, he stated,

> "[C]ommercial uses are very much interspersed throughout the length of this route. And in looking at the buildings in the area, the age of the buildings and looking at the new buildings, this area would be described by a planner as strip development that's in a state of transition which is being infused with different types of commercial development."

Entered into evidence was the "Master Plan" for the city of Belleville, prepared for the city in 1975. This witness found that "the existing zoning and the existing land use and the existing plan that they adopted are in conflict in this section of the City." Testifying to a trend toward additional new commercial structure in the area, he added, "I believe personally—

and I believe many planners would make a determination that that area is indeed commercial and that the commercialization of that area would continue in the future." Having observed that there is no area which he could describe as "a complete uninterrrupted single family area," he concluded:

"[T]he die has been cast. This is indeed a commercial street in the community. It is probably the most likely place for any new and future businesses. I see in the downtown area that downtown Belleville is going through the pattern that many cities throughout the country are going through. The downtown area, because of many factors, is losing its predominant position as the commercial location in the community and so the pattern taking place going out west on Main Street is very typical of many cities—that is that the area is changing to commercial and it would be my feeling in planning for the future the most logical thing to do would be to designate this area as commercial. Therefore, in looking at the master plan by the City, I do not feel that that plan shows a logical development for that area of West Main Street."

Having testified to the commercial character of the area, the witness addressed the unreasonableness of placing a walk-in bank facility in a classification different from that for a medical building, a mortuary or any other use permitted under C1. Referring to the zoning ordinance, the witness recited the uses permitted under C1 and explained that because there is no clause which would permit, for example, "all other similar uses," the ordinance limits C1 uses to those expressly set forth. Finding the ordinance discriminatory, he said,

"It does not mention a stock brokerage office, but it mentions an accountant. It does not mention any financial institution. To my way of thinking when we have developed uses for various types of districts we put uses of similar character and nature together in an area. I think because of the wording of this ordinance that it has not included the other types of offices that might be very compatible with some of the permitted uses here. For example, an architect's [sic] office [permitted under C2 but not under C1] could have much less traffic than a real estate office [permitted under C1]."

He testified that as a planner, were he planning the area, he would place a walk-in banking facility in the same category as the office uses expressly permitted under C1. The witness considered the use of a walk-in banking facility similar to some of those uses and a logical one within the C1 classification and testified that under the accepted practices of his profession he could find no reason for the exclusion of "this bank" from that classification.

The witness testified that he thought the use of a walk-in banking

facility would be compatible with the general area. He considered the walk-in facility "very similar" in its appearance and setback to C1 uses and noted the "very low density" of the proposed facility in terms of coverage of the site. He thought the proposed building could be used for a number of uses permitted under the present zoning classification if in the future the Bank did not use it.

The witness testified that under the present zoning for the property, that is, under C1, plaintiff could erect on its property a larger building than the one proposed and thereby create a more extensive use than the one proposed. Under the present zoning classification, he said, plaintiff could erect a six-story building on the site; it could construct a mortuary or multistory office building and generate much more activity than would the "proposed small bank facility." The witness indicated that if the building were devoted to medical offices, it would be particularly true that more activity would be generated and noted the presence of medical office buildings both to the west and to the east of plaintiff's site, the latter "[a]pproximately across from the proposed site, caddy-corner [*sic*]." The witness found it neither reasonable nor logical to permit a funeral home on the site but to prohibit a walk-in banking facility. In his professional opinion a C1 classification for the subject property bears no relation to the public welfare, health, safety or morals, and the proposed facility, if placed there, would be no more detrimental than uses permitted under C1 and would in no way endanger the welfare, health, safety or morals of the citizens of the area. The witness characterized the classifications within the Belleville zoning ordinance, particularly as applied to plaintiff's property, as "arbitrary, capricious, or unreasonable."

Describing West Main Street as "a very important major arterial route with a high traffic volume," the witness expressed the opinion that the addition of the estimated additional automobiles and pedestrians would not disrupt traffic or materially increase traffic volume on that street. In his opinion also the property surrounding plaintiff's would not be adversely affected if the proposed facility were built there; he foresaw neither an increase nor a decrease in the value of the surrounding properties.

For the defendant five residents of the area near plaintiff's property testified. Four of the five have resided there 27 years or more. In general, the residents expressed two principal concerns, the fear that the proposed facility would cause an exacerbation of the already difficult traffic conditions along that part of West Main Street and the fear that reclassification would permit other kinds of business on this site and on the residential sites in the area. On cross-examination two long-term residents, one of whom is an intervenor herein, indicated that they did not

object to the building proposed but to the classification, Heavy Commercial. A 40-year resident of the area, Norman Gundlach, objected to the facility, first, because "it is just another factor in destroying the residential portion of the City in that area" and, second, because "it creates additional traffic with all the hazards to go with it." Mr. Gundlach's wife, who owns the residence and is also an intervenor herein, was, according to one of the other residents who testified, one of the originators of the petition opposing the zoning amendment. On cross-examination Mr. Gundlach, an attorney, testified that he was a director of Bankers Trust, that he was one of the organizers of that bank and that he had represented it "[o]n a few matters sometime ago, but not more recently." He stated that his interest in that bank was "not very substantial" and indicated that he had no interest in another bank, the Bank of Belleville, beyond "a few shares." The Bank of Belleville and Bankers Trust, he said, have "a lot of common stockholders" and two common directors, the family of one of whom owns the majority of the stock of both institutions.

Defendants' other witness was a real estate appraiser, who testified that in his opinion "the change to C-2 definitely would affect first the immediately adjacent properties in that it might create a demand for them which would elevate the value somewhat but the other properties in the proximity of any C-2 use would have to eventually exert some deterrent in desirability and as a result, a loss in value." He was unable to say how large an area would be involved or to assign a particular dollar figure to the potential loss without the proposed facility actually in place. On cross-examination he said that from the standpoint of aesthetics, the proposed walk-in facility would have no substantial effect on surrounding property values.

■■ We turn first to defendants' contention that they are entitled to a reversal of the judgment as a matter of law because the memorandum of the trial court, which served as a basis for the final order, erroneously "place[d] the burden of proving the validity of the ordinance upon the City and upon Intervenors." Defendants cite no particular statement in the memorandum to support their position. Possibly their quarrel lies with the following: "Although the ordinance is presumed to be valid, this presumption must give way when as here the evidence fails to show such a reasonable basis [for the ordinance] exists." Although the trial court did not say that plaintiff bore the burden of overcoming the presumption of validity of the ordinance, he certainly did not say that defendants bore the burden of proving its validity. And while he might have described the weight of the evidence in positive rather than negative terms, he expressly acknowledged the presumption. We are unwilling to infer from the

phrasing of this statement—if, indeed, this is even the basis of defendants' argument—that the trial court was unacquainted with the effect of a presumption upon the burden of proof.

■■ Defendants argue as well that "[b]y failing to allege that the Ordinance in question has been arbitrarily or discriminatorily applied, the Bank is confining the issue solely to the validity of the Ordinance." By "validity" defendants appear to mean "procedural validity," which defendants point out, plaintiff did not attack at all. However, the argument is altogether without merit by virtue of paragraph 13(d) of plaintiff's complaint, in which plaintiff alleges as follows:

> "That said Ordinance No. 2707 [Belleville Zoning ordinance] is unconstitutional as it relates to the subject premises, and plaintiff's proposed use therefor, in that it is unlawfully discriminatory and arbitrary as to the uses allowed within the C-1, Light Commercial and C-2, Heavy Commercial Districts to the prejudice of the rights of plaintiff."

Defendants argue further that in a discussion of the deficiencies of plaintiff's evidence that plaintiff, in fact, failed to meet its burden of showing the invalidity of the ordinance. Neither party disputes the burden of the party seeking to show the invalidity of the ordinance. The law is well settled that

> "[a] zoning ordinance is presumed valid, and a party attacking such an ordinance has the burden of overcoming this presumption with clear and convincing evidence that the ordinance, as applied to the property in question (i) is arbitrary and unreasonable, and (ii) has no substantial relation to the public health, safety, morals or welfare. [Citations.] In deciding whether a property owner has discharged the heavy burden [citations] which the presumption of validity imposes upon him when he attacks a zoning ordinance, as well as in weighing the validity of the ordinance under attack, a court should consider the factors set forth in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65."
> (*Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 820, 387 N.E.2d 745, 747-48.)

The factors of pertinence here, as set forth by *La Salle* for consideration in determining the validity of an ordinance, include:

> "(1) The existing uses and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed

upon the individual property owner * * *." (12 Ill. 2d 40, 46-47, 145 N.E.2d 65, 69.)

As the court said in *La Salle,*

> "No one factor is controlling. It is not the mere loss in value alone that is significant, but the fact that the public welfare does not require the restriction and resulting loss." 12 Ill. 2d 40, 47, 145 N.E.2d 65, 69.

■ Where the gain to the public is small from a continuation of present restrictions, as opposed to the hardship to the owner of the subject property, and the evidence shows that the values of surrounding properties will not be seriously affected by the proposed use—some of the witnesses in the instant case testified that those values would not be affected at all—the courts are especially justified in declaring the ordinance unreasonable, confiscatory and void. (*Myers v. City of Elmhurst* (1958), 12 Ill. 2d 537, 147 N.E.2d 300.) While it is true that "[t]hose who purchase property with knowledge of existing zoning restrictions occupy an unfavorable position in challenging the validity of these limitations," nevertheless, such a property owner may prevail where there is "no gain to the public as compared with the economic detriment that will be sustained if the restriction were to apply." (*Fay v. City of Chicago* (1979), 71 Ill. App. 3d 603, 610, 390 N.E.2d 125, 131.) In the case at bar there was, of course, persuasive testimony that the public derived no gain whatsoever from the present restriction whereas the highest and best use of the property to plaintiff is as a walk-in banking facility.

■ Where testimony is contradictory in a trial without a jury, as here, the trial court, which is in a superior position to assess the credibility of the witnesses, determines the weight to be accorded the evidence. (*La Salle National Bank v. County of Cook.*) Thus, the standard of review in zoning cases is whether the determination of the trial court was against the manifest weight of the evidence. (*La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 388 N.E.2d 388; *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 377 N.E.2d 21.) There is no need to reiterate the facts set forth above to show that the trier of fact could reasonably have found that the plaintiff, with regard to the factors set forth in *La Salle,* overcame the presumption of validity with clear and convincing evidence and that the ordinance, as applied to plaintiff's property, was arbitrary and unreasonable and bore no relation to the public health, safety, morals or welfare. We are satisfied that the evidence amply supports the trial court's findings and judgment.

■ Defendants take issue with certain testimony of the land use planner who testified for plaintiff. Defendants cite his testimony on cross-examination in which he stated that the ordinance was discriminatory to

property on the north side of the street in the block between 70th and 71st Streets because "[i]t does not fit the land use pattern and it is not appropriate." At the same time he gave as an example of such discrimination the instant intersection. He mentioned particularly the C1 use of the mortuary on one corner and the two C2 uses of the filling station and tavern on the other and concluded, "[t]o me this land use pattern where you have—and I think most planners agree—where you have one or two uses out of four corners, all four corners should be in the same category. So I think the C-1 zoning in this case is discriminatory based upon the land use pattern." The cross-examiner pointed out to the witness, as he points out to the court in his brief on appeal, that Illinois law provides that a street is a proper boundary line. The witness responded:

> "I cannot quote Illinois law, but I do know in most zoning maps I have prepared and I have seen, you will find, on a main thoroughfare, the property fronting on Main Street is zoned commercial. The property that it backs up to is zoned residential, and that is a very normal standard relationship, and that the facing properties on both sides of a main street are in the same zoning category. That is very much the usual case on zoning maps that I have seen throughout Illinois."

In *Krom v. City of Elmhurst* (1956), 8 Ill. 2d 104, 111, 133 N.E.2d 1, 5, the supreme court recognized that a main artery of travel may or may not, according to the particular facts, be a suitable zoning boundary between residential and commercial districts:

> "Since *Forbes v. Hubbard*, 348 Ill. 166, where the zoning at the busy intersection of Harlem and Chicago avenues in the city of Chicago was under consideration, this court has given cognizance to the rule that in zoning territory of such a character, dividing lines of districts should be fixed in such a manner as to avoid making one side of a main artery of travel purely residential when the opposite side is already used as a business zone in such a manner as to establish its character in that regard. At the same time, however, we recognized in *Mundelein Estates, Inc. v. Village of Mundelein*, 409 Ill. 291, that a main artery of travel may, in some instances, constitute so natural and proper a dividing line between commercial and residence zones as to cause the property on one side of the highway to take its character from the residential district it adjoins rather than the commercial zone it faces."

While a street may form a boundary to a zoning district, it does not necessarily do so. We need not determine whether the highway in the instant case properly forms such a boundary since the defendants' objection to the witness' statements was that it conflicted with Illinois law, and, we have seen, the statements were, in fact, in harmony with it.

Furthermore, as the record shows and as defendants indicate in their brief, the difference in zoning classifications on opposite sides of a street is not the only way, in the opinion of this witness, in which the ordinance discriminates. His principal objection to the ordinance was its discriminatory permission of uses in the C1 classification that are as extensive as or even more extensive than certain C2 uses, including plaintiff's proposed C2 use. Reflecting this emphasis, the trial court in his memorandum relied on evidence of this latter form of discrimination but made no mention of evidence of the former, to which defendants object.

The defendants state as their final contention, "The fact that property will be worth more if rezoned for a different use does not support the conclusion that the zoning ordinance prohibiting that use is invalid, unconstitutional or confiscatory." Defendants claim, among other things, that "[t]he Court Order actually found that the Bank could make more money on the subject real estate and provide a public service that is not now available in this neighborhood if the zoning would permit the Bank's proposed facility." The court actually found that the C1 classification and denial of the plaintiff's use of the property for a walk-up banking facility "has no real or substantial relationship to the public health, safety and morals; that the gain to the public, [sic] is little, if any, by restricting the use of said property under said zoning ordinance as compared to the hardship to plaintiff, if the said property's highest and best use as a walk-up banking facility were not permitted; that, in addition, there are other benefits to the public by permitting the intended use of said property." The finding is in accord with the law, as discussed above. The highest and best use of the subject premises is one consideration of a court in determining the hardship imposed on the owner and, thus, whether an ordinance is arbitrary and unreasonable and bears no substantial relation to the public health, safety, morals or welfare. See *La Salle National Bank v. County of Cook*; *Hannifin Corp. v. City of Berwyn* (1953), 1 Ill. 2d 28, 115 N.E.2d 315.

As evidence of the real and substantial relation of the ordinance to the public welfare, defendants stress the "long term intentions of the Bank" to install a drive-in facility, reflected by Mr. Gundlach's testimony during cross-examination. The witness said that in the spring or summer of 1977 one of plaintiff's directors asked him about selling the property, owned by his wife and separated from the subject site apparently by a single lot, because plaintiff was interested in installing a drive-in banking facility on the site. In their brief defendants state that the Bank "discussed a purchase" of the property adjoining the subject property on the south with the owner and that "Ben Williams' property adjoins the subject premises on the West side." At trial both these property owners testified for plaintiff and expressed approval of the proposed facility. According to

the testimony plaintiff had once asked the owner of the property adjoining on the south if her property was for sale; nothing further came of the inquiry. The owner of the property to the west explained on cross-examination that though he had signed the petition in opposition to the reclassification, plaintiff had never approached him about purchasing his property, and the witness had decided later to favor the building of plaintiff's facility for the following reason: "Well, I tell you I found out afterwards that Mr. Gundlach was affiliated with the Banker's Trust and he never told us he was affiliated with them. If he had told us I would never have signed that petition." The witness indicated further that he and his wife had signed also the "Protest of Adjoining Owners" in the office of the intervenors' attorney, Mr. Wiehl, who notarized it. The protest, in evidence, was signed and notarized on the day of the city council hearing on the Moores' motion. The witness indicated on recross by the city attorney that he had not read what he had signed and, on recross by the intervenors' attorney, that no one had explained the written protest to him at the time they had executed it:

> "[T]hey just said, 'Would you sign it? Would you oppose the bank?' We went along but I didn't know you and Mr. Gundlach was affiliated with Banker's Trust. If you told me that, I wouldn't have signed it. You wanted to keep a competitor out. Why didn't you tell me you were affiliated with them? Why didn't Norman Gundlach tell me? He's my neighbor. Why didn't he tell me?"

Whatever the Bank's intentions might have been prior to its acquisition of the property at issue and prior to trial, the testimony at trial indicated not only plaintiff's intention to install a walk-in facility but also the problem of "back-up parking" if a drive-in facility were installed on an expanded site. The order of the trial court does not reclassify plaintiff's property from C1 to C2; the order permits, in addition to the uses allowed under the present C1 zoning classification, the development and use of plaintiff's property, within its present confines, only as a walk-in banking facility—not as a drive-in facility or a branch bank, not as a gas station or a tavern. The trial court reached its decision in terms of the reasonableness of the specific use proposed by plaintiff and by his order permits that use and no other. See *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406; *First National Bank v. Village of Morton Grove* (1973), 12 Ill. App. 3d 589, 299 N.E.2d 570; *Fiore v. City of Highland Park* (1966), 76 Ill. App. 2d 62, 221 N.E.2d 323.

For the stated reasons the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

SPOMER and KASSERMAN, JJ., concur.