OAK PARK TRUST AND SAVINGS BANK, Trustee, *et al.*, Plaintiffs-Appellees, *v.* THE VILLAGE OF PALOS PARK, Defendant-Appellant.

First District (5th Division)    No. 81-583

Opinion filed May 7, 1982.

Frank K. Neidhart and Thomas S. Moore, both of Chicago (McCarthy, Duffy, Neidhart & Snakard, of counsel), for appellant.

Rudnick & Wolfe, of Chicago (Theodore J. Novak and Don E. Glickman, of counsel), for appellees.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant Village of Palos Park (Village) appeals from a declaratory judgment in favor of plaintiffs that the Village's zoning ordinance is unconstitutional as applied to plaintiffs' property development plan for multi-family housing units. The sole issue presented for review is whether the judgment of the trial court was against the manifest weight of the evidence.

It appears that the property in question, located on the western boundary of the Village, is rectangular and consists of about 19.6 acres fronting on a heavily travelled highway. To the north is forest preserve property; to the south is one single-family house, a riding stable and a restaurant; to the east are two single-family houses; and, to the west, more forest preserve. Plaintiff Samuel Libert, who is the beneficial owner of the property, submitted an application and plans to the Village plan commission for rezoning of the property from single-family to a planned unit development, pursuant to a Village zoning ordinance. The plans called for construction of 155 units in clusters of buildings two stories high, four units to a building. The development also was to contain a recreation center, a clubhouse, an on-site sewage treatment plant, and areas of open space. Water was to be provided by well, and access to the site was to be from the highway. The plan commission vote was tied on plaintiffs' application, and thereafter the Village council rejected it. Plaintiffs then filed a complaint for declaratory judgment.

At trial, Libert testified that the property was formerly in unincorporated Cook County; that in 1963, the county granted him a special use permit for construction of a nursing home which was never built;[1] that the Village subsequently annexed the property and zoned it for single-family homes; that from the time he purchased the property in 1959 to the present, he received no inquiries for use of the property for single family homes and never listed it as such; and that he received offers for more intensive uses of the property.

In plaintiffs' case-in-chief, Rolf Campbell, a city planning and zoning consultant, testified that the proposed plan would be the highest and best use of the property based on such factors as its physical condition, availability of urban services such as fire and police protection, access to a major thoroughfare, adjacent uses such as single-family dwellings, open spaces and commercial establishments, and the need for the development relative to its "nominal adverse effect"; that another policeman would not

---

[1] After abandoning the plan to build a nursing home, Libert applied to the Cook County Zoning Board of Appeals to have the property rezoned for high-density, multi-family use. That application was denied.

be needed to provide service to the additional people; that although he made no study of Village expenditures for the proposed development, it would have a positive tax impact on the Village and generate tax revenues of about $276,000 per year and would yield a net increase in the tax base for each school child in the district as compared to a net decrease for a single-family development; and that, while the development appeared to conflict with the Village's comprehensive plan, such plan was subject to future interpretation and change. On cross-examination, he testified that the existing character and trend of development in the immediate area is single-family residential.

Louis Narcisi, a registered architect who designed the planned development, testified that from an architectural standpoint, the development was the highest and best use of the land; that his conclusion was based on subsoil investigations which revealed that the costs of foundation construction would be better distributed in a multi-family development; that soil permeability favors a sewage disposal plant over septic tanks for each lot; and that, if developed for single-family uses, some lots would have "objectionable views" and others would be adjacent to the highway.

John Morris, a registered engineer who provided the engineering design for the property, testified that site plans for drainage, sewer, water, lighting, streets and parking were submitted to the Village and not objected to; that adequate water supplies and storm drainage exist for the development, although he had not assessed the impact on water supplies of surrounding property owners; that after studying various features of the site and the requirements of Village ordinances and State law, he submitted a report for proposed sewage treatment facilities to the Illinois Environmental Protection Agency (IEPA), which it approved subject to specified changes in the final plan; that the type of sewage treatment plant—called the rotating biological disc sewage treatment system—planned for the development would conform to IEPA and Metropolitan Sanitary District (MSD) requirements, although the specific plan had not been submitted to the IEPA; that effluent produced by the on-site sewage treatment plant would be discharged into Mill Creek and could improve the condition of the waterway; and that septic tanks would be unsuitable for the property because of poor soil conditions.

Terrence O'Brien, a real estate appraiser, testified that the highest and best use of the property was the proposed development; that he based his conclusion on such factors as the transition of the area from rural to urban, the proximity of a major thoroughfare, forest preserve and commercial establishments, the capacity of the site to accommodate a multi-family development and the need for it, the lack of adverse impact

on surrounding properties and the lower fair market value of the site as now zoned as compared to the value if rezoned, and that, as zoned, the property is worth $300,000 but as rezoned it would be worth $515,000.

Paul Box, a traffic engineering consultant, testified that based on certain data, the highway which adjoined the property would accommodate the additional traffic from the development with the addition of a planned left-turn lane, so that the proposed development would have no adverse impact on traffic; that traffic would flow more efficiently from the proposed development with the added lane than in a single-family development with no left-turn lane even though less traffic would be created if the site were developed for single-family homes. On cross-examination, he testified that the cul-de-sac or dead-end design of the planned roadways was longer than usual because emergency exits were included; that the roadway system was comprehensible to drivers of emergency vehicles; and that adequate interior parking, sidewalks and walkways were planned.

In the Village's case-in-chief, Mayor Rosemary Kaptur testified that public sentiment was against the project; that the proposed development would require the Village to expand its police force, create traffic hazards and sanitation problems and discourage children from playing in Mill Creek because of pollution; that the development would cause increased expenditures for the Village, although she was unsure of the amount; that the basic objection of the Village to the development was its inconsistency with the Village's comprehensive plan; that she did not know if there had been previous deviations from the plan which itself stated that changes are expected, although she believed no deviation from the plan should be allowed to permit the development in question; and that the number of units for the development fell within the number allowed by the Village's planned unit development ordinance.

Walker Findley, a former chairman of the Village plan commission, testified that meetings were held between 1974, when preliminary plans for the development were first presented, and 1977 when the final plan was submitted to the Village; that the final plan contained many suggested revisions which were made at those meetings; that the plan commission, in adopting the Village's comprehensive plan, determined that the subject property would be best suited for single-family residential, with multiple-family residential on the east side of the Village; and that it did not recommend rejection of the plan, as there was a tie vote.

Richard Bailey, current chairman of the plan commission, testified that the Village had not received acceptable answers for sewer, storm water, and water supply problems.

Gerald Lindgren, a traffic engineer, testified that the internal roadway plan for the development was not "comprehensible" particularly for

emergency access; that if cars were illegally parked on the street, emergency and snow removal vehicles would be impeded; that the Village ordinance prohibits cul-de-sacs of more than 500 feet, while those in plaintiffs' plan are more than 1,000 feet; that the proposed streets are narrower than required by ordinance; that because of foliage, access to the highway would be difficult; and that such traffic problems would not occur with existing zoning.

William McCann, a real estate appraiser, testified that consistent with the present trend in the area, an economical viable use of the property would be as a single-family development "geared to an equestrian type of setting"; that the value of the property if rezoned would be worth between $480,000 and $560,000, but if zoned for single-family homes, the value would be $400,000 and less if extraordinary engineering costs were incurred; and that if the property were subdivided and roads were built, its value could increase substantially. On cross-examination, McCann testified that if an on-site sewage treatment plant met "EPA standards," a density of greater than one single-family home per acre would be appropriate; that the development would have "minor impact" on homes adjacent to the property; and that an appraiser from his office had previously testified in favor of another planned unit development in the Village which was inconsistent with the comprehensive plan.

Raymond Bliss, the Village engineer, testified that his firm made several comments and recommendations to the plan commission concerning various aspects of the site; that plaintiffs' plans did not indicate how the wells would be situated or connected to the main water system; that the Village might have to be a co-permittee for the on-site sewage treatment plant and would be ultimately responsible to the MSD; and that no contingency plan exists for containing the raw sewage at the site in the event of a power outage. He stated on cross-examination that he did not have objections to the proposed development but, rather, "concerns"; and that sewage treatment and disposal questions are governed by the rules of the IEPA and MSD.

Gordon Colby, an engineer working as health officer and building inspector for the Village, testified that the type of sewage treatment system planned for the development was hazardous, expensive, and unreliable; that only one such system was operating in Illinois; and that, because the property was low-lying, even single-family homes might encounter difficulties with waste treatment. On cross-examination, Colby testified that prior to the instant litigation he had never investigated such a system, had never personally inspected one, and was unaware the IEPA allows them.

Richard Stern, an urban planner, testified that the Village's comprehensive plan had merit and is one method of determining the highest and

best use of the land; that the highest and best use here was for single-family units, which is the trend of development around the site; that the single-family use would be more beneficial from a tax standpoint than would the multi-family use, although both would have a favorable tax impact; that no municipal facilities are currently available, but if sewer and water were available the best use would be for single-family units on one-half of the property and multi-family units on the other; and that, even if sewer and water were available, he would not recommend the proposed 155 units for the site. On cross-examination, he testified to preparing an alternative plan for the site showing single-family units and 50 or 60 multi-family units on the site; that a change in zoning classification would be required for constructing all the units in his plan; that the comprehensive plan was advisory and had been previously deviated from to allow the building of multi-family housing; that the nearby restaurant had the greatest adverse environmental affect on the property—followed respectively by the stable, the forest preserve, and the single family homes; and that the Village zoning ordinance was "not particularly well laid out."

Louis Fioretti, owner of the riding stable immediately south of the property, testified that the proposed project would hinder his business; that if the Village had issued Libert a building permit, he would have sold Libert an easement but no longer intended to do so.

Ayoub Talhami, an engineer for the MSD, testified that in order for plaintiffs to become qualified by the MSD for sewer services, they would have to be co-permittees with the Village. On cross-examination, he testified that since no formal application had been made, he could not comment as to whether a permit would be granted; that if a condominium corporation were formed to operate the site, the Village would not have to be a co-permittee; and that the restaurant, which operates an on-site sewage treatment plant, does not have the Village as co-permittee.

Several nearby Village property owners testified in opposition to the proposed development, stating that they believed it would depreciate their property values.

Robert Joost testified in rebuttal that he is a mechanical engineer and president and part owner of a company which manufactures and sells rotating biological disc systems like the one proposed for the site; that he was involved in the development of the sewage treatment system planned for the site; that such systems have existed commercially for over 25 years; that he had seen several hundred such installations in the United States and Europe; that over 100 such systems exist in Illinois; that the system has been approved in Illinois and in 40 other States; that the system is viable, dependable, and requires minimal maintenance; and that the system is in use in several cities across the State. On cross-examination, he testified

that such systems must be maintained by qualified operators and that he did not know how much it would cost to maintain one.

On February 10, 1981, the trial court held that the Village zoning ordinance, as applied to plaintiffs' property, was unconstitutional, inasmuch as it bore no reasonable relationship to the health, safety, morals and welfare of the Village, and that plaintiffs' proposed use of the property was reasonable and must be permitted. Accordingly, the court enjoined the Village from enforcing its zoning ordinance as to the plaintiffs' use of the property. From that judgment, the Village appeals.

OPINION

● 1 The test for determining the validity of a zoning ordinance was set forth in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, 69:

"Even though the validity of each zoning ordinance must be determined on its own facts and circumstances [citations] * * * among the facts which may be taken into consideration * * * are the following: (1) The existing uses and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner [citation], (5) the suitability of the subject property for the zoned purposes * * * [citations], and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. [Citations]."

An additional factor to be considered is the existence of a reasonable comprehensive plan for the area which incorporates valid zoning goals (*Wilson v. County of McHenry* (1981), 92 Ill. App. 3d 997, 416 N.E.2d 426), and while no single factor is controlling (*La Salle National Bank & Trust Co. v. County of Cook* (1981), 94 Ill. App. 3d 341, 418 N.E.2d 932), "of paramount importance [is] the question of whether the subject property is zoned in conformity with surrounding existing uses and whether those are uniform and established" (*Gregory v. City of Wheaton* (1961), 23 Ill. 2d 402, 406, 178 N.E.2d 358, 360).

■■ A zoning ordinance is presumed valid (*Dietz v. Village of Midlothian* (1980), 83 Ill. App. 3d 638, 404 N.E.2d 955), and the person attacking its validity bears the burden of establishing by clear and convincing evidence that the ordinance, as applied, is arbitrary, unreasonable, and not substantially related to the public health, safety, or welfare (*Tomasek v.*

*City of Des Plaines* (1976), 64 Ill. 2d 172, 354 N.E.2d 899). If, however, it appears that there is only a fair difference of opinion as to the reasonableness of a zoning classification, the legislative judgment prevails. (*Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 386 N.E.2d 309.) Furthermore, the trial court, from its superior position to assess the credibility of witnesses, determines the weight to be accorded the evidence (*Edgemont Bank & Trust Co. v. City of Belleville* (1980), 85 Ill. App. 3d 665, 407 N.E.2d 159), and the findings of the trial court will not be disturbed on review unless against the manifest weight of the evidence (*Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 377 N.E.2d 21). Having considered the entire record in the context of the above principles, we conclude that the trial court did not err.

First of all, concerning the existing uses and zoning of nearby property, the record indicates that the site is in a rural area of the Village and is zoned for public use and for one-acre single-family homes and that, consistent therewith, several single-family homes are located to the south and east. Equally important, however, is that forest preserve land, a riding stable, and a restaurant also are located nearby. While the stable and the restaurant are not of themselves uses which would require a zoning change, the presence of the forest preserve and a major highway also must be considered significant. The forest preserve, as the trial court noted, provides a "buffer" in the sense that it protects the single-family homes in the area against excessive use of nearby property for multi-family development. The proximity of the highway also is a relevant factor and here militates against single-family zoning. Although residential developments often adjoin heavily-travelled roadways and have not prevented courts from finding single family residence schemes to be suitable (*Zenith Radio Corp. v. Village of Mount Prospect* (1973), 15 Ill. App. 3d 587, 304 N.E.2d 754), "the existence of heavy traffic conditions on a thoroughfare scarcely constitutes an argument in support of a residential classification [citations], especially single family housing" (*La Salle National Bank v. City of Chicago* (1977), 54 Ill. App. 3d 944, 951, 369 N.E.2d 1363, 1368). In our view, the evidence supports the trial court's conclusion that surrounding uses are mixed and that the trend of development contemplates both single- and multi-family dwellings. Consequently, the existing uses and zoning of nearby property favor the proposed development.

Secondly, as to the extent to which property values are affected, there was testimony relevant to the value of both the subject property and adjacent property. Plaintiffs' appraiser testified that if single-family zoning were maintained, the property would be valued at $300,000, but if rezoned to permit the planned development, its value would be $515,000—or a

difference of $215,000 because of the zoning restriction. The Village's appraiser generally agreed with that testimony, stating that as presently zoned the property was worth $400,000, but if rezoned it would be worth between $480,000 to $560,000. Thus, if the property were not rezoned, plaintiffs' expected profit would be significantly reduced.

By contrast, the value of adjacent property would not be substantially affected. Both plaintiffs' and the Village's appraisers generally agreed on this question. Plaintiffs' appraiser testified that the planned development would have no depreciatory effect, and the Village's stated that at most the impact would be minor. Although several nearby property owners testified that the development would cause a reduction in the value of their property, we believe that in view of the expert testimony, their statements were conjectural. Indeed, Patricia Goes, an adjacent landowner, testified that she recently subdivided her property and sold some of the one-acre lots for as much as $62,000 each, which is significantly more than the appraised value of lots on the subject property and thereby supports the view of the experts that the adverse effect on adjoining property would at most be minor. Thus, here we believe that "general statements by lay witnesses regarding fear of reduction of their property value have small significance." (*Oak Forest Mobile Home Park, Inc. v. City of Oak Forest* (1975), 27 Ill. App. 3d 303, 316, 326 N.E.2d 473, 484.) Finally, we note that Libert originally invested $123,000 in the property and that by the analysis of either expert, he would earn a large profit. Consideration of return is appropriate here, since the economic harm to plaintiffs is significant under the present zoning plan while the detriment to the public from the proposed rezoning is minimal. (*Cf. Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 384, 402 N.E.2d 719, 730-31.) In light of the facts presented, however, the impact on property values would on the whole be more positive with the proposed development.

Next, taking the third and fourth criteria of *La Salle* together—the extent to which destruction of plaintiffs' property values promotes the general welfare and the gain to the public relative to the hardship on the property owners—we think it clear that the present zoning classification provides the community with few benefits while causing plaintiffs unnecessary hardship. In this regard, plaintiffs' planner testified that the proposed development would produce surplus tax revenues over expenditures and increase the available tax base per student. Although plaintiffs' and the Village's planners disagreed as to whether the development would yield a greater surplus of tax dollars than would a single-family development, the Village's planner agreed that a multi-family development would have a favorable tax impact. Furthermore, plaintiffs' ap-

praiser testified to the need for housing in the price range offered by the development and that it would blend in with and preserve the surroundings.

We are also of the view that plaintiffs' proposed on-site sewage treatment system would not pose a threat to the public welfare. The record indicates that it would satisfy IEPA requirements and would be more feasible for the site than a septic system because of site features and poor soil conditions on the property. Moreover, the proposed system would not create significant pollution hazards and may in fact improve the water quality of Mill Creek. Also, plaintiffs' engineer, as well as one of the system's developers, testified that the system would provide reliable and effective treatment. Against this testimony was that of the Village's engineer, which in substance was that he only had "concerns" about the system, particularly that the Village would be a required co-permittee of the system. Additionally, the Village's appraiser and its land planner testified that, assuming adequate water supply and sewage could be provided, both would recommend a density of greater than one-acre single family. Plaintiffs' engineer testified that water supplies and storm drainage were adequate, although no tests were conducted to determine the impact the development would have on the water supplies of surrounding homeowners. However, the Village adverts to no evidence that the increased demand for water at the site could not reasonably be met. Also, while the Village contends that plaintiffs' proposed sewage treatment facility was not submitted for approval, we do not think the record shows it to be unfeasible, even though an easement may have to be acquired to convey effluent to Mill Creek. (*Cf. La Salle National Bank v. County of Cook* (1977), 52 Ill. App. 3d 76, 79, 367 N.E.2d 131, 134, in which the court found the record to be "totally devoid of any evidence of the availability of" water, sanitary and storm sewers and solutions to water run-off problems; also see *Du Page Trust Co. v. Village of Glen Ellyn* (1978), 60 Ill. App. 3d 409, 376 N.E.2d 1049.) Finally, we are not persuaded that the present zoning classification substantially reduces the amount of traffic in the area. The Village does not argue that the highway is lightly travelled; but, rather, though it is heavily travelled, the area is properly zoned for single-family residential. Neither does the Village contend that the increased volume of traffic will have any adverse effect.

On the other hand, the hardship on plaintiffs, as referred to above, is in the form of substantial lost profits under the present zoning classification. As stated in *DeMarie v. City of Lake Forest* (1981), 93 Ill. App. 3d 357, 363, 417 N.E.2d 641, 645-46:

> "The less substantial the relationship of the zoning to the public health, safety, comfort, morals and welfare, the more likely the zoning is invalid and the more significance the diminution in value

is given as one of the criteria of invalidity. Additionally, * * * the confiscatory effect of zoning has no reference to the amount originally paid for the piece of property. Rather, it is evidenced by the difference between the fair cash market value of the property as presently zoned with what that value would be if the property were put to the proposed use. [Citation.]"

Here, depending upon which figures are adopted, plaintiff will lose between $115,000 and $260,000 under single family zoning. Such sizeable difference between the value of plaintiffs' property with current zoning and the value under the proposed use suggests that plaintiffs have experienced substantial hardship.

Even if the Village were to incur costs of providing municipal services which outstripped increased revenues, or if the Village were required to become a co-permittee of the site's sewage treatment plant, such consequences, in the absence of factual support in the record, does not justify the Village's refusal to rezone the subject property. (See *Glassey v. County of Tazewell* (1973), 11 Ill. App. 3d 1087, 297 N.E.2d 235, in which the court rejected a similar contention that a possible increase in government expenditures warranted denial of requested zoning.) Speculation that the proposed development might cause increased local government costs or that the sewage system might be unfeasible, lacking as it does factual support, is not a valid basis for denying a proper use.

We are also of the belief that the property is less suitable for single-family than for multi-family development. The record reveals several reasons why the current zoning is inappropriate. Some of the property is low-lying and would require grading, and some of the soil is poor. Moreover, certain lots located along the highway may be difficult to sell as single-family, and the problem of sewage disposal would continue to confront single family residents at great cost. Both plaintiffs' engineer and the Village's health officer testified that the property was not adaptable to septic systems, and even with the type of sewage systems often used at single-family residences, it would require that effluent be removed from the property at great cost. Furthermore, the lowering of the value of the subject property for plaintiffs without any apparent corresponding gain to the public supports our conclusion as to the unsuitability of the property as zoned. As stated in *Ritter v. Village of Morton Grove* (1979), 70 Ill. App. 3d 640, 647, 388 N.E.2d 968, 973-74:

"The final factor of relevance in this analysis is the suitability of the property for the zoned purpose. As our supreme court has stated, '[t]he law does not require that the subject property be totally unsuitable for the purpose classified but it is sufficient that a substantial decrease in value results from a classification bearing no substantial relation to the public welfare.' (*La Salle National*

*Bank v. County of Cook* (1957), 12 Ill. 2d 40, 48, 145 N.E.2d 65, 69-70.)" (Also see *La Salle National Bank v. City of Park Ridge* (1979), 74 Ill. App. 3d 647, 393 N.E.2d 623.)

In addition, Libert testified that except for some inquiries no interest had ever been expressed to him for use of the property as single family. In the present case, therefore, while it is clear that the subject property would not be totally unsuitable for use as single-family residences, we believe that a substantial decrease in the value of the property to plaintiffs has resulted from the present classification and that no substantial relation to the public welfare is apparent. Accordingly, we conclude that the present classification causes undue hardship on plaintiffs without promoting the health, safety, morals or general welfare of the Village in any discernible manner.

The final factor under the *La Salle* test is the length of time the property has been vacant as zoned. Here, the property has been vacant as zoned since 1963 when it was purchased by the current owner. Although Libert never actively marketed the property as zoned, he received inquiries about the property but no offers for its use for single-family homes, despite the fact that through public hearings over the proposed rezoning, the property attained publicity.

In general, the party relying on the length of time its property has been vacant must establish that the property is unsaleable, vacant, or undeveloped because of the zoning classification. (*Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 402 N.E.2d 719; *Western National Bank of Cicero v. Village of Downers Grove* (1970), 122 Ill. App. 2d 107, 257 N.E.2d 803.) However, in the present case, there were unsuccessful attempts to develop the property when Libert sought and was granted a special use permit for construction of a nursing home and when he unsuccessfully sought rezoning for multi-family use from the Cook County Zoning Board of Appeals. Those events, coupled with the evidence that no offers were received to use the property as zoned, do not in our view lead to the conclusion that improper zoning was not the reason the property has remained vacant or that the property has remained vacant because of plaintiffs' choice. We believe, therefore, that the length of time the property has been vacant weighs in favor of the proposed zoning change.

■ Finally, we believe that the Village's comprehensive plan was properly considered. The record indicates that the plan generally calls for the placement of more intensive uses, such as commercial and multi-family, at the business center of town and for less intensive uses in areas away from the business center. Although such a plan must be considered, it is not the predominant factor. (*Cleys v. Village of Palatine* (1980), 89 Ill. App. 3d 630, 411 N.E.2d 1161; *Parkway Bank & Trust Co. v. County of*

*Lake* (1979), 71 Ill. App. 3d 421, 389 N.E.2d 882.) In the present case, the Village's land planner testified to preparing a schematic showing 68 units for the property, contrary to the comprehensive plan, and the planner and the Village's appraiser testified that if satisfactory sewer and water were provided, a use more intensive than one-acre single-family would be appropriate. The planner further testified that the Village had previously departed from the plan for purposes of permitting another multi-family development, and the appraiser testified that a member of his staff had previously testified in favor of a multi-family development contrary to the plan. The plan itself was described as "advisory" and as contemplating changes.

■ Although not presented as separate issues, the Village raises several questions related to the trial court's decision. First, the Village contends that the use of a rotating biological disc system was not proposed to it prior to trial. In this regard, we note that the IEPA apparently changed its regulations shortly before trial, no longer allowing activated sludge systems like the one plaintiffs originally proposed, and instead permitting the rotating biological disc system. Plaintiffs thus proposed to employ such system in order to meet IEPA regulations. It further appears that the Village would have rejected plaintiffs' planned development even with the new system; that, as the Village mayor testified, the sewage treatment problem was "peripheral"; and that the Village plan commission chairman would remain opposed to the plan even if engineering problems were solved. A party challenging the constitutionality of a statute as applied in an arbitrary or discriminatory manner must ordinarily pursue all administrative remedies before seeking judicial relief. (*Walker v. State Board of Elections* (1976), 65 Ill. 2d 543, 359 N.E.2d 113.) In the present case, however, the rule requiring exhaustion of administrative remedies through resubmission of the plan, including the new sewage treatment system, is inapplicable inasmuch as administrative relief would not be forthcoming (*Northbrook Trust & Savings Bank v. County of Cook* (1977), 47 Ill. App. 3d 879, 365 N.E.2d 433, *cert. denied* (1978), 434 U.S. 1069, 55 L. Ed. 2d 771, 98 S. Ct. 1249; *Bass v. City of Joliet* (1973), 10 Ill. App. 3d 860, 295 N.E.2d 53), and the fundamental dispute between the parties would be unchanged (*Sulzberger v. County of Peoria* (1963), 29 Ill. 2d 532, 194 N.E.2d 287). It is similarly unavailing for the Village to assert that plaintiffs' plan is indefinite and requires resubmission, since the record indicates that the Village would not approve it in any event. As to the Village's claim that the proposed sewage treatment plan is dangerous, we note, as discussed hereinabove, that the record does not support such conclusion.

■ We also find no basis in the record for the Village's claim that the trial court failed to consider the Village's objections to plaintiffs' plan for

providing utilities. To the contrary, the trial court deferred to the expertise of the MSD and other appropriate administrative agencies and as part of its final order stated that the planned development could proceed only upon "proper application and compliance with all applicable codes." Thus, it appears to us that the IEPA has given preliminary approval to plaintiffs' sewage disposal system, and construction cannot proceed unless both the IEPA and the MSD approve sewer, water, and drainage plans within their competence, inasmuch as their approval is determinative. We believe the trial court's deference to those agencies on such matters was proper. See *Treadway v. City of Rockford* (1962), 24 Ill. 2d 488, 182 N.E.2d 219; *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406; *Smith v. County Board* (1980), 86 Ill. App. 3d 708, 408 N.E.2d 452; *Wright v. County of Winnebago* (1979), 73 Ill. App. 3d 337, 391 N.E.2d 772.

Finally, we believe that contrary to the Village's position, the trial court gave proper weight to the presumed validity of the ordinance. As stated in *Bauske v. City of Des Plaines* (1957), 13 Ill. 2d 169, 181, 148 N.E.2d 584, 590:

> "Mere conflict in testimony as to the highest and best use of property, the impact of the proposed land use on the areas involved or its effect upon property values, does not make irrebuttable the presumption that an ordinance is valid."

It is apparent from the record that plaintiffs' evidence constituted more than a fair difference of opinion concerning the reasonableness of the classification; indeed, they have met their burden of demonstrating that the zoning ordinance in question is arbitrary and capricious (*cf. Dietz v. Village of Midlothian* (1980), 83 Ill. App. 3d 638, 404 N.E.2d 955); and the trial court, in our view, properly performed its basic task of balancing the hardship imposed upon the property owner against the gain, if any, to the public (see *Jeisy v. City of Taylorville* (1980), 81 Ill. App. 3d 442, 401 N.E.2d 627).

We recognize that property owners are entitled to the unrestricted use of their property, subject only to restraints necessary to protect the public welfare. (*Columbus Park Congregation of Jehovah's Witnesses, Inc. v. Board of Appeals* (1962), 25 Ill. 2d 65, 182 N.E.2d 722.) Zoning laws which limit the rights of property owners are enacted pursuant to the State's police power which, when delegated to a municipality, must have a real and substantial relationship to the health, safety, morals, or welfare of the public (*La Salle National Bank v. City of Chicago* (1977), 54 Ill. App. 3d 944, 369 N.E.2d 1363), and if it is shown that a challenged zoning ordinance, as here, bears no reasonable relationship to the public welfare, it must fall (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65).

For the reasons stated, we hold that the decision of the trial court was not against the manifest weight of the evidence, and we affirm.

Affirmed.

LORENZ and MEJDA, JJ., concur.