BOUGHTON TRUCKING AND MATERIALS, INC., *et al.*, Plaintiffs-Appellees, *v.* THE COUNTY OF WILL, Defendant-Appellant.—(The Bank of Naperville, Trustee, *et al.*, First Intervening Defendants-Appellants; William Clow *et al.*, Second Intervening Defendants-Appellants.)

Third District   No. 82—200

Opinion filed January 11, 1983.

Edward Petka, State's Attorney, of Joliet (Randal Miller, Assistant State's Attorney, of counsel), for appellant County of Will.

Timothy J. Reuland, of Lindner, Speers & Reuland, P.C., of Aurora, for other appellants.

Thomas R. Wilson and Raymond E. Meader, both of Herschbach, Tracy, Johnson, Bertani & Wilson, of Joliet, for appellees.

JUSTICE ALLOY delivered the opinion of the court:
The defendants, County of Will and certain individual and corpo-

rate intervenors, appeal from the decision of the circuit court of Will County, sitting in review over a denial by the county board of a request for a special use permit by plaintiffs Boughton Trucking and Materials, Inc., and Lloyd Boughton, Roy Brossman, Leona Boughton and IAA Trust Company (hereinafter Boughton). The circuit court found that the county zoning ordinance, and the denial of a special use permit to Boughton thereunder, bore no substantial relationship to the public health, safety and welfare, and that, as applied to Boughton's application, it was arbitrary, capricious and void. It ordered that Boughton be permitted to use the subject property for the purpose of mining and quarrying sand, gravel and limestone. From the court's decision, overturning the county's action in denying a special use permit, the defendants now appeal. They contend that Boughton failed to meet its burden of establishing that the board's action was arbitrary, capricious and bore no substantial relationship to the public health, safety and welfare; (2) that the trial judge's findings of fact were contrary to the manifest weight of the evidence; and (3) that the trial judge improperly substituted his judgment for the legislative judgment made by the county board.

The record reveals that the plaintiffs are the owners and would-be developers of a 201-acre parcel of property located in Wheatland Township, Will County. Plaintiff Walter Boughton entered into an option to buy the site in 1979, and at that time it was zoned A—1 Agricultural, being used as a farm. Thereafter, Boughton filed an application with the county requesting a special use permit, under the existing A—1 zoning district, for the mining and quarrying, with blasting, of the deposits of sand, gravel and limestone underlying the subject property. Approximately 100 acres of the property would be mined and quarried, with the remaining acreage either farmed or acting as a buffer zone. Plaintiff Boughton Trucking and Materials, Inc., is engaged in the business of mining and quarrying sand, gravel and limestone at a site approximately three-quarters of a mile south of the subject property. Both the zoning board of appeals and the county board of Will County voted to deny the requested special use permit to Boughton. Thereafter, Boughton filed the instant action in circuit court seeking review over, and reversal of the county board's denial of the special use permit for mining and quarrying. In the trial court, various contiguous and nearby property owners intervened as defendants, seeking affirmance of the county board's action.

■ The applicable rules concerning challenges to zoning actions by a legislative body are well established and not disputed herein. As set forth by the Illinois Supreme Court in *La Grange State Bank v.*

*County of Cook* (1979), 75 Ill. 2d 301, 307-08, 388 N.E.2d 388:

> "*** Because zoning is mainly a legislative function [citation], it is primarily within the province of the local municipal body to determine the uses of property and to establish zoning classifications [citations]. As this court has previously asserted:
>
> > 'It is clear from many holdings of this court that a zoning ordinance will be upheld if it bears any substantial relationship to the public health, safety, comfort or welfare. An ordinance will be presumed to be valid, and the one attacking an ordinance bears the burden of demonstrating its invalidity. The challenging party must establish by clear and convincing evidence that the ordinance, as applied, is arbitrary and unreasonable and bears no substantial relation to the public health, safety or welfare. [Citations.]' [Citation.]
>
> The relevant factors that the trial court may consider in determining the validity of a zoning decision were enunciated by this court in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47. In the special use context, these factors have been summarized as follows: 'the uses and zoning of nearby properties, the extent to which existing zoning diminishes the property's value and the proposed zoning enhances it, the suitability of the property for the purposes permitted under the existing zoning, and the relative gain to the public as compared to the hardship imposed upon the property owner by the existing and the proposed zoning uses.' [Citation.] No one factor is controlling. [Citation.]" (See also *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40; *Meyer Material Co. v. County of Will* (1977), 51 Ill. App. 3d 821, 366 N.E.2d 1149.)

It is also firmly established that the trial court, sitting without a jury in such actions, is to weigh the conflicting testimony, and its findings will not be disturbed unless contrary to the manifest weight of the evidence. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 48.) As the court in *La Salle National Bank* also noted, the validity of each zoning ordinance and action must be determined on the facts and circumstances involved, set within the general considerations set forth above. With these rules in mind, we turn then to consideration of the relevant factors, within the factual context of this case.

     There is no dispute that the subject property, at the time of the court hearing and for many years previous, had been used essentially for agricultural purposes as a corn and bean farm. The property is not within 1½ miles of any municipality and is situate in an unin-

corporated area of Will County. Zoning is A—1 Agricultural, allowing certain agricultural uses, and permitting mining and quarrying only when specifically authorized by the county board as a special use. It was a special use permit, under A—1 zoning, that Boughton sought from the county in order to operate a mine and quarry operation. The existing uses and zoning of nearby property were accurately stated by the trial court in its findings:

> "8. The nearby land to the North, East and West of the subject land is used and zoned A—1 for agricultural purposes for grain farming as is the East half of the land adjoining to the South, while the West half of the land adjoining on the South across 111th Street has been used and zoned for a number of years as a quarry with blasting operated by Avery Gravel Company together with a concrete plant operation, the Avery property consisting of approximately 140 acres having been rezoned by Will County in 1980 for general industrial use with a special use for quarring and mining with blasting and the operation of a concrete plant. To the West of the property approximately one-quarter (1/4) mile West of the DuPage River is a church and to the Northwest of the property from three-quarters (3/4) to one mile Northwest of the river is a residential subdivision of approximately 160 acres in area. There is a scattering of farm houses and agricultural buildings in all directions from the subject land. One-half (1/2) mile South of the Avery quarry [bordering the proposed property on the southwest] is a quarry on the North side of 119th Street operated by the Plaintiff, Boughton Trucking and Materials, Inc. Immediately South of the Boughton quarry on the South side of 119th Street is a quarry operated by E and E Hauling Company. Approximately one mile Southeast of the latter quarry is a quarry operated by Elmhurst-Chicago Stone Company. All of these quarries mine limestone with blasting."

While agricultural use dominates most of the adjacent land, it is evident from the record that considerable mining and quarrying is done on adjacent and nearby property to the south. There is no dispute that valuable deposits of limestone, sand, and gravel underlie the subject property.

The evidence concerning the economic implications of the proposed special use, on the property itself and on adjoining and nearby properties, was somewhat contradictory. Boughton's evidence indicated that the highest and best use of the property was for the proposed mining and quarrying, with a subsequent return to open space,

pursuant to applicable requirements for reclamation under the county zoning ordinance. The experts' testimony indicated that the property's farm value was $3,000 to $4,000 per acre, while its value as a mine and quarry was double that, or $8,000 to $8,500 per acre. The defense expert testimony focused upon the economic effect of the proposed use upon nearby property. That evidence indicated that the property of the Clows, the intervening defendants, lying contiguous and immediately north, had a market value between $2,900 and $3,400. It was the expert's opinion that if the Boughton property were quarried, values on the Clow land would fall on the low side of that range, or $2,900. This finding was disputed by plaintiff's expert, who concluded that there would be no adverse affect upon the surrounding farm property from the addition of another quarry on the proposed property. As noted, there is an existing mining and quarry operation, with blasting, on nearby property to the south.

Conflicting evidence was also before the court respecting various effects of the mining operations upon nearby properties. An explosives expert, who had done extensive blasting in the Will County quarries for a number of years, testified to the relatively limited number of complaints about blasting and as to the limited effects of blasting. Plaintiff Walter Boughton, who utilizes blasting at his nearby quarry, testified to the minimal damage accompanying such operations. Boughton could not deny that the blasting causes perceptible vibration, and one intervening defendant, a nearby resident, testified that the blasting from the existing quarries causes windows to shake in her house and the contents of the house to rattle. The evidence also indicated Boughton's plans and intentions to comply with applicable regulatory provisions of the county zoning ordinance which prescribes procedures for the handling of explosives and the blasting, and establishes hours for such work.

The court also heard evidence upon the effect of the proposed mining and quarrying upon the area's water supply. A geologist who had done limited field testing testified for the plaintiffs that the proposed quarry would have no effect upon shallow water wells 1,000 feet or more from the quarry site and little effect on those closer. He testified that there would be no effect upon properties to the west and north of Du Page River, where the intervening defendants' properties are located. Deep water wells, according to plaintiffs' experts, would not be affected. The defense expert, while admitting he had not made field tests, testified that the operations could adversely affect wells, and he questioned the sufficiency of the testing done by plaintiff's geologist.

■■ ■ With respect to these factors, the court made the following findings of fact, which we find supported in the evidence:

"9. There is blasting two to three times per week at the Avery quarry [adjacent to proposed quarry on the southwest] and the Boughton quarry and there have been several complaints regarding noise and vibration, but not damage to any structures or wells and no injuries to persons resulting from the quarry operations.

10. The mining and quarry of the subject land as proposed by plaintiffs will not substantially adversely affect the wells, structures and improvements on or the use and enjoyment of nearby properties. Plaintiffs' proposed use of the subject land will not be injurious to the use and enjoyment of other property in the immediate vicinity or impair property values within the immediate area. All of the evidence of the defendants as to damages from the Plaintiffs' proposed quarrying operations was conjectural and speculative and due to the fear of the general public of mining operations involving blasting. These fears can be alleviated by the strict regulations of the various governmental bodies having jurisdiction over such operations.

* * *

12. A permit has been issued to the Plaintiff, Boughton Trucking and Materials, Inc., by the Illinois Environmental Protection Agency for its initial gravel mining operation on the subject land and it will have to secure a further permit for its operation of the proposed quarry.

13. Boughton Materials will use water sprayers to prevent dust air pollution and a system of sediment ponds to prevent water impurities and sedimentation from being discharged into the Du Page River. Plaintiffs' proposed use will not cause air or water pollution. Adequate provisions for drainage are also provided in Plaintiff's proposed use."

With respect to the findings as to damage to nearby properties, both physical and economic, the defendants point to their experts' testimony in urging that the court's findings are contrary to the manifest weight of the evidence. As noted, previously, however, the plaintiffs' evidence was based upon past effects of previous mining and quarrying and upon tests at the present site. We find that an issue was presented which required an assessment of credibility and a determination as to the weight of the evidence, which matters are for the trial court. We will not disturb its findings. Neither do we find the court's conclusions with respect to the highest and best use of the property

contrary to the manifest weight of the evidence.

"14. The Will County Land Use Plan for the subject property is for multiple family, commercial and open space uses which are not its highest and best use. The Land Use Plan was not followed by Will County in 1980 when the Avery parcel adjoining to the South was zoned for general industrial uses together with quarrying with blasting and concrete special uses, it having also been planned for multiple family and open space uses. The quarrying of the adjoining Avery parcel and the concrete plant operation thereon and the corridor of quarries South along the Du Page River are the dominant uses in the area of the subject land other than agriculture. There is no probable prospect for development of the subject land or the lands adjoining for residential purposes in the foreseeable future."

The defendants, especially the county, assert that the evidence before the trial court established that there would be considerable adverse effect upon county roads in the area, if the proposed quarry operations were permitted. The county superintendent of highways testified that the existing heavy use of two principal roadways in the area by currently operating quarries is causing considerable damage, resulting in large scale road failure in the area. He testified that neither 111th Street nor Plainfield-Naperville Road were designed to handle the truck traffic presently on them. He testified that 111th Street, at the time of trial, had only one year's useful life left, and that it would need widening and resurfacing. The defense expert agreed that 111th Street was under severe structural stress and in need of repair. The county's man also testified that the Plainfield-Naperville Road could be expected to last for another 10 to 12 good years, although it would eventually succumb to damage from the use by quarry trucks. It was his testimony that the expected life use of the road would be cut in half, if the proposed quarry operation were permitted. The defense expert did not quarrel with condition of the road, or its current useful life projection, but his testimony was that the additional traffic generated from the proposed quarry would have only a negligible impact on Plainfield-Naperville Road, given the existing heavy use from other quarries in the area. The trial court found:

"Although Plaintiffs' proposed use of the subject land will generate a daily average of one hundred quarry trucks on 111th Street and Plainfield-Naperville Road, adequate access roads exist in that the same roads are used by quarry trucks from the Avery, Elmhurst-Chicago, E & E Hauling, Material Service and the present Boughton Materials quarries. Both Naperville Road

and the 111th Street are presently and will remain burdened by truck traffic serving these other quarries and in any event will require maintenance and repair to sustain such traffic. The increase in traffic will not by itself substantially damage or shorten the life of these roads; that, in any event, Will County will in the future have to resurface 111th Street and rebuild Plainfield-Naperville Road. The Plaintiffs' operating plan provides adequate measures for ingress and egress so as to minimize traffic congestion in the area."

The county, on this appeal, asserts that its evidence as to road damage demonstrates the considerable detriment to the public welfare, in terms of costs of repair, if the proposed operation is permitted. We find, however, that the evidence was conflicting on this question and that the trial court's determination thereon is not contrary to the manifest weight of the evidence. We find the court correctly concluded that the county would experience problems with both roads in the future, regardless of the additional traffic from the proposed quarry. These are roads which already carry the quarry traffic from five other nearby quarries, and they were not designed for such heavy use. The evidence was that continuing damage was being done, requiring resurfacing of 111th Street in the immediate future, regardless of any increased traffic. As concerns Plainfield-Naperville, it is difficult to believe, and the trial court did not, that the addition of trucks from the proposed quarry, by itself, would result in shortening the useful life of that road by five to six years.

The county also objected to the planned earthen berm at the edge of the rights-of-way on 111th Street and the Plainfield-Naperville Road. It asserted that such berms will result in extra hazards for motorists, decreasing visibility and increasing the problem of snow removal. However, as the plaintiffs point out, the county zoning ordinance requires the six-foot-high earthen berm, with a chain link fence, and specifies that it shall be on the borders of the property. The highway superintendent testified that a setback of 30 feet for the berms would solve the hazards he anticipated.

●■ ■ To summarize thus far, the facts, as found by the trial court and as supported in the record, indicate the proposed use is consistent and compatible with adjoining current uses; is not disruptive to long-range planning, as stated and as actually developing; and does not significantly diminish property values of adjoining properties or otherwise adversely affect them. Under these circumstances, the county's argument that the property's current agricultural use is profitable and beneficial loses some of its impact. No one denied that the

farm use was profitable, but the evidence was clear that its highest and best use was a quarry, and that such use would result in a doubling of the value of the property. Certainly, that is not determinative, as plaintiffs' took an obvious business risk when obtaining the option with its current zoning. (*Meyer Material Co. v. County of Will* (1977), 51 Ill. App. 3d 821, 828, 366 N.E.2d 1149.) On the other hand, the property need not be unsuitable for its classified use, and "it is sufficient that a substantial decrease in value results from a classification bearing no substantial relation to the public welfare." (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 48, 145 N.E.2d 65.) The question of the suitability of the property for its present use must be viewed in conjunction with the overall issue of benefit and harm to the public and the landowner. Here, under the facts as found below, denial of the proposed permit would work an economic hardship on the plaintiffs, while permitting the operation would have little adverse impact upon the public or surrounding landowners. The defendants' general assertion that the property has contributed to the public good as a farm may well be true, but even the county acknowledges the valuable natural resources underlying the property and their benefit, in the way of commerce, for the county and the area. The fact that the property is suitable as a farm is not determinative or conclusive as to whether the county's action in denying the special use permit is to be upheld. The evidence, as determined by the trial court, whose findings are supported in the record, establishes that there would be substantial hardship upon the landowner, with little corresponding public benefit, if the action of the county board is upheld. In addition, the evidence does not establish any significant harm to the public if the property is developed as a mining and quarrying operation. The trial court expressly found that the proposed use would not be detrimental to the public health, safety, or welfare. The public welfare was found not to have a substantial relationship with the denial of the special use permit to plaintiffs. We agree with the trial court's findings. Plaintiffs met their burden of proof and the court's findings on the evidence were not against the manifest weight.

One other finding of the court is pertinent, as it bears upon a central argument of the defendants on appeal. The court found:

"The limestone, sand and gravel on the subject site are valuable natural resources needed for the general welfare of the public and as such, should be preserved for mining purposes. There is no doubt that a quarry is a useful enterprise."

The defense does not deny the usefulness of the property for mining and quarrying, nor the valuableness of the property as a mine and

quarry. Rather, the county takes the position that it had the power to deny the special use request, based upon the factors already mentioned and upon their desire and decision to preserve the natural resources for future development. Pointing to evidence in the record of a slackening demand and an adequate supply of sand, gravel and limestone, the county asserts that it is a considerable public benefit to have this land set aside for future development, as a mine and quarry, rather than for current development. Initially, the argument has a superficial attraction, for no one disputed that supply is ample and demand decreasing. However, upon reflection, the argument is not sound. The county, acting as conservator of the county's resources, broadly asserts the public benefit in keeping these resources untapped, so as not to deplete the future reserves available for use and development. However, the specific benefits to the county and the public in preventing current development are not put forth. Just how the public will benefit from preventing Boughton from operating a mine and quarry is not shown by the defense. There is no showing for a community need for these resources that will be adversely affected unless the permit is denied. Nor is it shown how the county's revenues, employment, or situation would benefit by denying the permit at this time, while permitting development in the future. The fact is that the resources are on private land, owned by private individuals. Saving the resources for the future would have a potential benefit to some future developer who could obtain the property for a lesser value as a farm. No specific and direct benefit to the public in saving the resources was established. The land and the resources thereon are not the public's, but the owners' property. In the instant case, not permitting development causes a significant percent decrease in the value of the property to him. If we were to conclude that the county may decide which privately owned resources are to be developed, and which are to be left for future development, the effect would be to give the county the power and authority to decide which private developer can profit from his investment and which cannot. There is some demand for sand, gravel and limestone, albeit a decreasing one at this time, but such circumstance does not allow the county, in effect, to determine who is permitted to compete for that limited demand, all under the guise of saving resources on private property for some future, vague, and undefined public good. (See *Swain v. County of Winnebago* (1969), 111 Ill. App. 2d 458, 467-68, 250 N.E.2d 439.) Furthermore, we question the county's conclusion that the resources of Will County would be saved. The net amount of resources available will be the same regardless of whether this quarry is opened or not.

The difference is that the distribution of available resources will vary among property owners. If the present permit is denied, the plaintiffs will pay the price of "reserving resources for future use." If plaintiffs are permitted to operate the mine and quarry, then the burden of possessing future resources will fall upon all of the quarry operations, depending, of course, upon the effects of the market.

The county did not sufficiently establish a public need for the preservation of these resources until some future date. The plaintiffs did meet their burden of showing that the denial of the permit bore no substantial relationship to the public health, safety and welfare. The trial court decision and judgment is affirmed.

Affirmed.

HEIPLE and SCOTT, JJ., concur.