NEW LENOX STATE BANK, as Trustee, Plaintiff-Appellant, v. THE COUNTY OF WILL et al., Defendants-Appellees.

Third District   No. 3—89—0646

Opinion filed November 16, 1990.

458

STOUDER, J., dissenting.

Troha, Troha & Bednare, Ltd., and Lyman C. Tieman, of Lyman C. Tieman & Associates, both of Joliet (George P. Troha, of counsel), for appellant.

Edward Burmila, State's Attorney, of Joliet (Judith Z. Kelly, of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellees County of Will and Will County Planning and Zoning Commission.

Thomas R. Wilson, of Herschbach, Tracy, Johnson, Bertani & Wilson, of Joliet (Michael J. Martin, of counsel), for appellee Yvonne Steigle.

Michael J. Martin, of Dunn & Martin, Ltd., of Joliet, for appellee Mary A. Kelley.

JUSTICE GORMAN delivered the opinion of the court:

Plaintiff New Lenox State Bank, as trustee under trust number 936, filed an application for a zoning change seeking to have an 8.74-acre parcel of property in Will County rezoned from A-1 (agricultural) to I-3 (intensive industrial) with special use for an asphalt plant. The 8.74-acre parcel is at the southern edge of a larger 80-acre tract that was allowed I-3 mining status with blasting use pursuant to a 1976 court decree. The zoning change for the 8.74 acres was recommended, with conditions, by the Will County planning staff, the Will County Zoning and Planning Commission, and the Will County Land Use and Zoning Committee. The Will County Board, however, voted 25 to 1 against the trustee's rezoning request. The trustee filed a complaint in the circuit court of Will County requesting a declaratory judgment invalidating the zoning ordinance of the property as being arbitrary and capricious. The complaint was later amended, adding as defendants the County of Will and Mary Kelley and Yvonne Steigle, who had filed legal objections and are owners of property near the 8.74-acre parcel. The cause was heard in June 1989, and on July 25, 1989, the circuit court issued an order denying the relief sought by the trustee. The trustee's post-trial motion was also denied. Trustee appeals. We affirm.

During the trial, the plaintiff presented several expert witnesses. Craig Hullinger testified first. Hullinger is a city planner who had worked for Will County as executive director of the Will County Regional Planning Commission from 1975 until 1977 and who had prepared the Will County land use plan and the Will County Zoning Code adopted by the county. An aerial map prepared by Hullinger shows that the proposed site is located on Plainfield-Naperville Road, approximately 3½ miles north of Plainfield and, consequently, sewer and water access. The parcel is currently zoned A-1 with a 1976 court order allowing quarrying operations. The 8.74-acre parcel contemplated for the asphalt plant is situated at the south edge of the 80-acre parcel. Directly to the east lies 80 acres containing a farm, a house, and several farm buildings, all zoned A-1. The area to the south and east of the road is all farmland zoned A-1, and approximately 2½ miles south is an old quarry which has become a lake. Some residences have been built near that exhausted quarry. To the west of the site is situated the Du Page River. Immediately to the north of the site, there are a number of quarries, which are approved by court order. The first is one-half mile north and has just been recently expanded by court order. A concrete plant is located in one of these quarries.

Hullinger testified that the Will County plan, which is the long-term plan for this area, calls for open space and eventual residential use of the area. The Plainfield plan and the Wheatland Township plan agreed. Hullinger opined that the proposed asphalt plant and a quarry fit well into this plan. He indicated that when the quarry stone is exhausted, the asphalt plant will be removed and the quarry will become a lake. Residential use of the area will ensue. Hullinger testified that the use sought for the asphalt plant is temporary in nature. Hullinger further testified that 90% of the material for asphalt is comprised of stone and gravel. The nearest asphalt plant is the K-5 plant located on Route 59, approximately 10 miles north from the proposed asphalt plant. Hullinger testified that the gravel from the quarry is put into trucks and trucked north to the K-5 plant and then brought back to the area as asphalt. He opined that there is considerable savings having the asphalt plant in the area. He further testified that the population is dramatically increasing, and the area has tremendous growth and a need for an asphalt plant. It was his opinion that a quarry and asphalt plant were transitional.

Hullinger testified that from a planning viewpoint, a quarry with blasting is worse and more intense than an asphalt plant. He testified that the asphalt plant would not be detrimental to the health and welfare of the people and would not have an impact on the area or hurt property values. He further indicated that the proposed site was an ideal site for an asphalt plant and did not conflict with the Will County plan, the Plainfield plan, the Wheatland Township plan, and all the other plans which he had helped to adopt for the area in 1975. This asphalt plant was an interim use, and the land would eventually develop into open space, residential space, and the asphalt plant would disappear.

William McCann, a real estate appraiser/consultant for 32 years and a licensed real estate broker, testified next. His qualifications were stipulated to. He had appraised the property seven or eight years previously for the owner for a transaction wherein the owner gifted the property to his children. The two primary uses in the area at that time were agriculture and quarry, with mining, and there were two quarries north of the site. McCann reported that one quarry recently was approved for expansion to the north of the site. McCann testified that there are various pockets of farm buildings and residential areas. To the southwest across the Du Page River, there are plans for a subdivision and some light industry. McCann opined that quarries turning into open space and lakes increase the property values and their attractiveness. He defined the highest and

best use as the greatest net return to the owner over a period of time and considered the need and demand and the compatibility of the use with the area. McCann added that the most important factor was the impact on the value of other property due to the asphalt plant. He opined that the asphalt plant was very appropriate, and it fulfilled all the criteria of highest and best use.

As to location, McCann testified that the parcel is located within one of the most rapidly growing districts in Will County. McCann indicated that the area is somewhat underdeveloped and that an asphalt plant enhances the value and marketability of that property. He further opined that it is not in any way detrimental to the surrounding property values. The highest and best use is for an asphalt plant, and it is a natural adjunct to the ongoing mining operation. McCann further opined that the asphalt plant operation would be less intensive than the quarry operation existing now and the quarry operation existing to the north of the property.

On cross-examination McCann stated that the value of farmland in the area was $2,000 to $3,000 an acre, but that as industrial land it would be worth approximately $20,000 to $30,000 an acre. The value of the property for residential purposes would be somewhat higher. McCann indicated that the land surrounding the parcel in question is currently used for agricultural use and in the future would be developed residentially. Since 1978, there have been very minor changes in the immediate area. McCann stated that the market is already accepting residential usage near quarrying by virtue of the fact that a very expensive residential area had been planned and approved on the west side of the Du Page River advancing toward the quarries.

The owner of the beneficial interest of the land trust, Edward F. Heil, testified next. He is chief executive officer of the American Environmental Construction Company. He has experience in quarries and construction. He purchased the land in 1978, and the quarry situated on the 80-acre parcel has been in operation for 20 years. Heil testified that an asphalt plant in the area could save the users and consumers of asphalt $4 to $8 a ton. He indicated that there is a need because the area is expanding residentially, commercially, and industrially very quickly. Heil indicated that without competition there are not enough plants in the immediate area to service the area. He opined that truck traffic would be reduced substantially as asphalt could be made on site. Heil stated that it would be a portable plant and would exist there for probably 7 to 20 years, the expected life of the quarry on the 80-acre parcel. It would be moved when the

quarry is exhausted. He had agreed to all of the conditions of the planning staff. Heil further indicated that the plant is a state-of-the-art plant that meets current environmental standards.

Gary Papke, a real estate consultant and urban planner, testified next. Papke testified that he had done surveys for asphalt plants in the area in 1984 and had updated those surveys for the metropolitan area of Chicago, including this area. According to Papke, asphalt plants located near residential areas in his studies and surveys do not cause significant problems and he had encountered very few complaints about such operations.

John Weitendorf, a registered broker and appraiser in Will County, testified next. His qualifications were stipulated to. Weitendorf indicated that the 448-acre parcel across the river from the quarry was just rezoned residential, which indicated to him that an asphalt plant or quarry would not hurt future development of residential areas, which is the plan for the area. Plainfield-Naperville Road would enjoy some of the same growth as Route 59 north from Plainfield. It would be industrial and commercial along the road with residential in the back. Weitendorf commented that the area is growing quickly, and that the logical place for an asphalt plant is in a quarry, where 75% of the material for asphalt comes from stone, 20% from sand, and 5% from petroleum. Because of the development, farmland around this area would enjoy a tremendous increase in value. The highest and best use is that use which will support the highest selling price of the property. He considered both need and location. Building permits in Plainfield, Plainfield Township, Wheatland Township, Bolingbrook, and Romeoville have increased substantially in 1987 and 1988, showing a need for asphalt. The location is excellent, according to Weitendorf, because one should be within 20 to 30 miles of the building area to haul asphalt.

Rolf Campbell, a planning and zoning consultant for many municipalities and private industry, testified next. Campbell has testified in 1,000 cases on zoning. He helped draft the original zoning code and planning code for Will County and other counties, including Cook County. He testified that this was an appropriate location for an asphalt plant. The zoning change is compatible with the uses around the parcel and with the future plans of open space, recreational, and residential uses for the area. It is for interim use. He is familiar with the factors involved under the Will County zoning ordinance and all of the factors considered under the ordinance. Campbell opined that it will not be detrimental to or endanger the public health and safety and will not adversely affect the use and enjoyment of the adjacent

properties. From a land use standpoint, Campbell testified that an asphalt plant is desirable, and from a zoning standpoint, it meets the necessary criteria.

Paul Gorte testified next. Gorte is the current director of planning for the Will County Planning Commission. He approved the final report of the proposal to the Will County Planning Commission. The report contained certain conditions, which the owner agreed to. The planning staff recommended that an asphalt plant be approved with the conditions and made that recommendation to both the Planning and Zoning Commission and the Land Use and Zoning Commission. His testimony that both bodies approved the change was not allowed into evidence, and the offer of proof was denied.

Douglas Morita testified next for the plaintiff. Morita is employed by Polytech, Inc., as a mechanical engineer. Morita testified that he studied the plans for the proposed asphalt plant and also studied the ordinances and the EPA standards governing asphalt plants. He stated that the asphalt plant would comply with the standards and would have no adverse effect on the public health, safety and general welfare where it would be situated.

Thomas Franzen was the last witness for the plaintiff. Franzen testified that he was an operator of an asphalt plant and was familiar with a double drum mix plant, which is the type proposed here. He had operated one near a residential area and had received no complaints and experienced no problems with it as far as noise or dust. He stated that there was more noise from a quarry than from an asphalt plant.

At the conclusion of the plaintiff's case, the defense filed a motion under section 2—1110 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1110) for judgment in favor of the defendants. The court denied the motion.

The defendants initially called Michael Brown, the assistant planner in charge of Wheatland Township. Brown testified that he felt the proposed use was incompatible with the plans for the area. Brown indicated that he did a survey by telephone of the asphalt plants in the Will County area, noting that the Elmhurst and the New Lenox plants had been approved, but had not been built, and did not go into operation. He checked into the need for an asphalt plant by contacting Howard Reeves, who operates three asphalt plants in Will County. Brown asked him about the capacity of the plants, and he stated that they were operating anywhere from $33^{1}/3\%$ to 60%. Brown did not interview the owners of the other two asphalt plants, but relied on the information from Reeves that they were not

operating at any more than 60% capacity.

On cross-examination by the plaintiff's attorney, Brown stated that the surveys were made basically by phone and that the information that he got was from Reeves.

The defense also called Mary Kelley, the owner of 80 acres immediately across the road from the proposed site and 179 acres farther north. Kelley's plans for the area are for agricultural use for the reasonable future and eventually residential. She opposed the asphalt plant because she felt that it detracted from the agricultural use, there would be emission and pollution problems, and drainage and traffic problems. Kelley opined that it was not desirable for residential use.

On cross-examination, Kelley stated that she lived five to six miles away and wanted to continue farming the area for the reasonable future, which she considered to be at least 20 years. She would not mind a lake across the street from her property, but would not want an asphalt plant.

The trial court entered its findings. It first denied the affirmative defenses which had been raised. Then, citing *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65, and *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406, the court applied its findings of fact to the factors outlined in *La Salle National Bank* and *Sinclair Pipe Line*. The court concluded the analysis by finding in favor of the defendants and against the plaintiff. The trial court also denied the plaintiff's post-trial motion. The plaintiff appeals.

The law concerning challenges to zoning actions by a legislative body is well settled and not in dispute here. As our supreme court stated in *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 307-08, 388 N.E.2d 388:

> "Because zoning is mainly a legislative function [citation], it is primarily within the province of the local municipal body to determine the uses of property and to establish zoning classifications [citations]. As this court has previously asserted:
>
>> 'It is clear from many holdings of this court that a zoning ordinance will be upheld if it bears any substantial relationship to the public health, safety, comfort or welfare. An ordinance will be presumed to be valid, and the one attacking an ordinance bears the burden of demonstrating its invalidity. The challenging party must establish by clear and convincing evidence that the ordinance, as applied, is arbitrary and unreasonable and bears no substantial relation to the

public health, safety, or welfare. [Citations.]' [Citation.]"

■ This court, following *La Salle National Bank* and *Sinclair Pipe Line,* in *National Bank v. County of Will* (1987), 151 Ill. App. 3d 957, 503 N.E.2d 842, cited eight factors that should be taken into consideration in determining the validity of a zoning ordinance. They are: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property value of the plaintiff promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as opposed to the hardship imposed upon the individual property owner; (5) the suitability of the subject for the zoned purposes; (6) the length of time the property has been vacant as zoned considered in the context of land development in the area; (7) the care with which a community has undertaken to plan its land use development; and (8) the evidence, or lack of evidence, of community need for the use proposed by the plaintiff. As the court in *La Salle National Bank* commented, "[N]o one factor is controlling." *La Salle National Bank,* 12 Ill. 2d at 47.

■ It is also well settled that "the trial court, sitting without a jury in such actions, is to weigh the conflicting testimony, and its findings will not be disturbed unless contrary to the manifest weight of the evidence." *(Boughton Trucking & Materials, Inc. v. County of Will* (1983), 112 Ill. App. 3d 26, 29, 444 N.E.2d 1128, citing *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 48, 145 N.E.2d 65.) The appellant contends that the trial court's decision is against the manifest weight of the evidence. We now examine the trial court's findings and consider appellant's attacks on these findings.

The first factor the court is to consider is the existing uses and zoning of the nearby property. The court essentially made two types of findings as to this factor: the property adjacent to the 8.74-acre parcel and the character of property in the general vicinity of the 8.74-acre parcel. The court found that much of the property adjacent to the 8.74-acre parcel is used for quarrying operations. The other property adjacent to the 8.74-acre parcel is either low-lying land along the Du Page River or farmland.

As to the character of the area, the court found that with the exception of the quarrying operations which had been allowed by court order, there is no heavy industrial use in the area. There is some light industrial use fairly close to the 8.74-acre parcel, but the remainder of the area is agricultural which is rapidly developing into residential use. While it is true that there is no residential develop-

ment adjacent to the 8.74-acre parcel, the court found that there are planned residential developments within close proximity to the 8.74-acre parcel. The court found this factor to be equally balanced between the plaintiff and the defendants.

The second factor to be considered by the trial court is the extent to which the property values are diminished by the zoning restriction. The court noted that the current zoning on the 8.74-acre parcel is agricultural, but the allowable use pursuant to the court decree is as a quarry. The court found that while there was testimony from appraisers that the highest and best use of the 8.74-acre parcel would be for use as an asphalt plant, the record is devoid of any evidence that the land value of the 8.74-acre parcel or the 80-acre parcel is diminished one iota by the denial of the placement of an asphalt plant on the 8.74-acre parcel. The court noted that neither of the appraisers testified as to any dollar diminution of the value of this property.

The trial court found this factor to be strongly in favor of the defendants since there wasn't any testimony regarding diminution of property value. On appeal, the trustee contends that the trial court erred by requiring evidence on diminution of property value. The trustee contends that the focus should be on the loss of economic benefit from the plant. Pointing to the "highest and best use" testimony of Messrs. McCann and Weitendorf, trustee contends that this evidence was unrebutted by the defendant.

Citing *Edgemont Bank & Trust Co. v. City of Belleville* (1980), 85 Ill. App. 3d 665, 407 N.E.2d 159, the trustee contends that highest and best use evidence is a proper consideration for a court to employ when determining the hardship imposed upon an owner by an ordinance. Trustee maintains that since the trial court failed to consider the highest and best use evidence, the entire judgment fails and cannot be sustained.

We note that the court did not reject the highest and best use evidence offered by Messrs. McCann and Weitendorf. It simply stated that the record was devoid of any testimony regarding diminution of value. The trustee apparently contends that *Edgemont Bank* obviates the need for a plaintiff to demonstrate a diminution in value. We disagree with that assertion.

In *Edgemont Bank*, the plaintiff bank sought to have certain property in Belleville, Illinois, rezoned from C1 light commercial to C2 heavy commercial. The previous owner of the property was unsuccessful in obtaining a zoning change from the city council. The bank filed an action in the trial court seeking declaratory and injunc-

tive relief. The trial court declared the zoning classification unconstitutional and void as applied to the bank's property and enjoined the defendant city from preventing the bank's development and use of the property for C2 purposes. *Edgemont Bank*, 85 Ill. App. 3d at 666-67.

The defendant City of Belleville and certain intervenors appealed the trial court's decision. One of their contentions was "[t]he fact that property will be worth more if rezoned for a different use does not support the conclusion that the zoning ordinance prohibiting the use is invalid, unconstitutional or confiscatory." *Edgemont Bank*, 85 Ill. App. 3d at 677.

The appellate court responded that "[t]he highest and best use of the subject premises is one consideration of a court in determining the hardship imposed on the owner and, thus, whether an ordinance is arbitrary and unreasonable and bears no substantial relation to the public health, safety, morals or welfare." *Edgemont Bank*, 85 Ill. App. 3d at 677.

The court in *Edgemont Bank* took pains to demonstrate the gain to the public achieved by denying the zoning change was minimal or nonexistent. See, *e.g., Edgemont Bank*, 85 Ill. App. 3d at 675 ("In the case at bar there was, of course, persuasive testimony that the public derived no gain whatsoever from the present restriction whereas the highest and best use of the property to plaintiff is as a walk-in banking facility").

In the instant case, there was evidence that indicated that the denial of the zoning change would benefit the public. For example, during the cross-examination of Mr. Hullinger, he testified that an asphalt plant was not compatible with single-family residential use, the eventual use contemplated by planners for the area. Mr. McCann speculated that the asphalt plant would be used as long as it was "economically viable." This could be as long as the quarry is in operation, estimated by Mr. McCann to be 7 to 20 years.

■ We are of the opinion that *Edgemont Bank* is distinguishable from the instant case. In *Edgemont Bank* the court was careful to point out that little or no gain would come to the public by denying the zoning change. Here, it appears that there exists a gain to the public by denying the zoning change. Accordingly, the highest and best use evidence put on by the plaintiff does not obviate the need for showing diminution in value. The failure by the plaintiff to demonstrate a diminution in value clearly weighs this factor in favor of the defendants.

The third factor to be considered by the trial court is the extent

to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public. The court found no evidence that the plaintiff's property value has been destroyed. The court did not discuss any findings relative to whether the public will benefit from the denial of the zoning request. The court found this factor in favor of the plaintiff.

The fourth factor to be considered by the trial court is the relative gain to the public as opposed to the hardship upon the individual property owner. The court indicated that factors two, three and four are interrelated and we agree. The court reiterated that the evidence was lacking in regard to diminution of value. The court found this factor to be split equally between the plaintiff and defendant.

The fifth factor to be considered is the suitability for the zoned purpose. The court indicated that the property was well suited for use as an asphalt plant. The court found this factor to weigh heavily in the plaintiff's favor.

The sixth factor to be considered by the trial court is the length of time the property has been vacant as zoned. The court found that the property has not been vacant as zoned by the court decree. The court found that the property had been used constantly as a quarry since 1977. The court found this factor to weigh in favor of the defendants.

The seventh factor to be considered by the court is the care with which the community has undertaken to plan its land use development. The court found that a great deal of time and effort were expended in planning the area. The court indicated that the plan for the area is presently agricultural with development of residential areas and open space along the river. This factor was found to be moderately in favor of the defendants.

The last factor to be considered by the court is the evidence of community need for the use proposed. The trial court commented on the evidence regarding the great amount of building taking place in the area. The court also commented on the evidence regarding other asphalt plants in the area, noting that these plants are not operating at their full capacity. The court put special emphasis (calling it "telling") that there were plants allowed to be constructed which have not yet been constructed. This, the court concluded, indicated that the need was not as great as conveyed by the plaintiff's witnesses. The court thus found this factor to be moderately in favor of the defendants.

Plaintiff was required to prove his case by clear and convincing evidence. This the plaintiff did not do. We find that ample evidence

exists to support the trial court's decision.

Our finding on the issues discussed herein makes it unnecessary to consider other matters raised by the appellant.

For the reasons listed above, the decision of the circuit court of Will County is affirmed.

Affirmed.

SCOTT, J., concurs.

JUSTICE STOUDER, dissenting:

After reviewing the opinion in the above-captioned case, I must respectfully dissent. I disagree with the analysis presented regarding the eight factors listed in *National Bank v. County of Will* (1987), 151 Ill. App. 3d 957, 503 N.E.2d 842.

Initially, I agree that the second factor weighs in favor of the defendants because the plaintiffs did not present evidence showing a diminution in the value of the property due to the zoning restriction.

The fourth factor, however, requires the court to consider the relative gain to the public as opposed to the hardship upon the individual property owner. The opinion indicates that factors two, three, and four are somehow interrelated. I disagree. The eight factors are to be viewed individually. If said factors were not independent of one another, there would have been no need for the court to delineate among the eight factors.

Here, all of the experts emphasized that the use as an asphalt plant was the highest and best use, but that the use was only as an integral part of the existing quarry and, as such, could not be assessed individually. Under these circumstances, the failing to testify as to the diminution in land values does not warrant the inference that the plaintiff (property owner) failed to prove hardship due to the zoning restriction.

In the instant case, the record shows the plaintiff testified that building the asphalt plant in the quarry would save approximately $3 million annually for his company. This is not only a significant savings to the company, but to the consumer as well. Also, at a time when this area of Will County is experiencing a surge in development, the reduction in truck traffic and the increased tax revenues from the property represent a significant benefit to the public. The defendants, meanwhile, presented no evidence to counter this evidence. Accordingly, I find the fourth factor to weigh heavily in the plaintiff's favor.

Additionally, the seventh factor is the care with which the community has undertaken to plan its land use development. The extensive testimony here revealed that Hullinger, a person who helped develop the plan for Will County, testified that the asphalt plant fit well into the county plan and that it was less intense than a quarry. The trial court ruled in favor of the defendants, stating that the asphalt plant would not promote residential development. I note that residential developments are planned for this area and that the existing quarries have not deterred residential developers from purchasing and developing land in close proximity to these quarries. Indeed, it has been demonstrated that, after the quarries are exhausted, they become excellent areas for residential development. If the quarries fail to deter residential development, then neither will the asphalt plant.

I further disagree with the analysis of the eighth factor. The eighth factor requires the court to consider the evidence or lack of evidence of community need for the use proposed by the plaintiff. The trial court and the opinion emphasize the fact that two asphalt plants have been approved and not yet built. The record contains no evidence of why this is so. The trial court speculates that this must be due to their being no need for such asphalt plants. The plaintiffs counter with evidence that over 1,000 truck loads of stone per day leave the region for asphalt plants outside the area. The defendants presented evidence of a phone call to a local asphalt plant owner who stated that his plant was operating between 33% and 60% capacity. This testimony must be taken with a grain of salt for it's hard to imagine that the plant owner would say something to the effect that "we're operating at full capacity, and we sure need a competing asphalt plant to take some of our business." The trial court, in my opinion, erred in finding this factor to weigh in favor of the defendants.

The gist of my disagreement, however, centers on the trial court's emphasis on a single factor in making its determination. As stated in the opinion, the court in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65, emphasized that "[n]o one factor is controlling." Here, the trial court and the opinion rely primarily on the fact that the plaintiffs failed to submit evidence indicating that the property has suffered a diminution in value as a result of the ordinance. This factor, significant as it must seem to the trial court, is no more significant than the other seven factors. The *National Bank* case lists many factors, all of which must be given consideration before a decision is rendered. In addition, these

types of cases need not be decided on a mathematical basis. The plaintiff does not necessarily win if he proves successful on five factors, nor does he lose if he fails to prove successful on four. The law requires that the trial court not base its judgment on one factor. After reviewing the substantial evidence presented by the plaintiffs in this case and after reviewing the trial court's order, I find the trial court, in contravention to *La Salle National Bank*, erroneously relied on one factor in rendering this decision. For these reasons, I respectfully dissent.