CAROLYN A. KAMBICH *et al.*, Plaintiffs-Appellees. v. THE VILLAGE OF RIVERWOODS, Defendant-Appellant.

Second District   No. 2—98—1304

Opinion filed November 17, 1999.

Jack M. Siegel and Andrew R. Greene, both of Altheimer & Gray, of Chicago, for appellant.

Harry N. Arger, of Rooks, Pitts & Poust, of Chicago, for appellees.

JUSTICE McLAREN delivered the opinion of the court:

The defendant, the Village of Riverwoods (the Village), appeals the trial court's judgment in favor of the plaintiffs, Carolyn Kambich and the Deerfield Montessori School, Inc. (collectively, the School), finding the Village's special use ordinance invalid and amending the ordinance to allow a maximum of 170 students at the School. We reverse.

The following facts are taken from the record. The plaintiffs, Carolyn Kambich and the Deerfield Montessori School, Inc., filed a two-count complaint against the defendant, the Village of Riverwoods. In count I, based on the theory of equitable estoppel, the School sought to enjoin the Village from enforcing an amended special use ordinance limiting the plaintiffs to 120 students. Count I also sought an order declaring the ordinance invalid and recognizing the School's vested property rights in continuing to use the property as a school without any numerical, age, or other limitation on enrollment. Count II alleged that the amended special use ordinance was invalid because it was arbitrary and capricious and bore no substantial relation to the public health, safety, or general welfare. Count II sought an injunction and an order declaring the ordinance invalid and recognizing the School's vested property rights in the continuing use of the property as a school without any numerical, age, or other limitation.

Plaintiff Carolyn Kambich was the beneficial owner of property commonly known as 3140 Riverwoods Road, or lot 9, in the Vernon Oaks subdivision of the Village of Riverwoods. Plaintiff Deerfield Montessori School, Inc., provided preschool and grade school education to children at that and three other locations. Carolyn and her husband, Anthony Kambich, owned and operated the school, as well as other facilities, leasing the property from a trust for $20,000 a month. Carolyn held the beneficial interest to that trust and was the secretary and executive director of the school. Carolyn and Anthony Kambich received salaries and bonuses of $140,000 a year and $70,000, respectively. Their daughter, Lisa Kambich Courtney, who taught and did administrative work, received a salary of $40,000; their sons, Anthony Jr. and Douglas Kambich, did part-time work for the school organization.

In 1986, the School purchased property in the Village of Riverwoods for the purpose of operating a Montessori school. The property included two buildings on a 10-acre lot. At the time the property was zoned for residential use. On March 19, 1986, the School requested and the Village adopted ordinance No. 86—3—7, which granted a special use for the property. The special use ordinance was limited to the two existing buildings, the 2,000-square-foot farmhouse and the

2,500-square-foot flat-roofed building. At the time, the School represented that the buildings could accommodate 67 students, 22 in the farmhouse and 45 in the flat-roofed building.

In 1989, the School purchased an adjoining three-acre lot, making the total acreage of the site approximately 13 acres. The newly acquired property was zoned as an R-1 42,000-square-foot single-family residence district. One of the lots, which occupied approximately 3.4 acres, was occupied by the School. The Kambiches developed the remaining eight lots with single-family homes and sold the lots for $125,000 and $135,000. Each lot was improved with a single-family home ranging in value from $1.1 to $1.5 million.

Then in 1996, Anthony announced at a Vernon Trails Homeowners Association (Homeowners Association) meeting plans to replace the existing farmhouse with a 10,000-square-foot two-story building in the nature of a single-family residence. David Ritter, a Vernon Trails subdivision homeowner, testified that Anthony told the attendees that he expected an additional eight or nine students.

In January 1996, the Kambiches met with Village trustee Elmer Ciesel, an architect and the Village building official. According to Ciesel, the Kambiches informed Ciesel that they planned to build a replacement building for the farmhouse and that they expected an additional seven or eight students. In March 1997, Anthony Kambich again announced plans to increase enrollment by six to eight students. At the time there were 67 students at the school. At trial, Anthony Kambich denied ever telling the Homeowners Association or anyone associated with the Village that he would not have more than 80 students.

By April 10, 1997, the new building had been built; however, it was a single-story structure, instead of the two-story single-family style structure originally planned. In June 1997, the farmhouse was demolished.

In June 1997, David Abell, an attorney for the school, applied to the Village for an amendment to the special use permit. The application stated that the "contemplated use is essentially the same as presently conducted on the property."

On August 7 and 11, 1997, hearings were held on the application before the Village plan commission (Commission). The Village then met on August 18, 1997, and recommended the approval of an amendment for special use with several conditions, including a numerical limitation of no more than 120 children present each day. On September 3, 1997, the Village adopted the amended special use ordinance, ordinance No. 97—9—13, containing the conditions recommended by the Commission.

Frank H. Whipple, a real estate appraiser, testified that an increase to up to 225 students would not adversely affect the surrounding properties. However, he acknowledged that the increase in students would increase the activity on the site and the traffic coming to the site.

Jacques Gourguechon, a city planning consultant, testified that 225 students would have only a minimal impact on the surrounding area and would be an appropriate and harmonious use of property in the neighborhood.

Gerald Lindgren, a traffic engineer, testified that he conducted numerous studies and concluded that traffic for 225 students a day could be sufficiently and adequately accommodated in the area.

Robert Teska, an urban planning consultant and civil engineer, testified that he observed the traffic conditions near the School and the Vernon Trails subdivision. Teska opined that the increase in enrollment would cause an increase in noise, traffic, and potential traffic hazards and that this would affect the neighboring property. He stated that neighboring property owners had a right to rely on existing zoning.

Mayor Stranger, the mayor of Riverwoods, an architect and former building and zoning officer, testified that he lived one-half mile from the School. He also stated that the homes in the Vernon Trails subdivision are rather large and very expensive. Mayor Stranger opined that an increase of students from 60 to 250 would impact the adjacent neighborhood. Mayor Stranger testified that, in August 1997, Anthony told the mayor and Ciesel that he expected only an additional six to eight students. Anthony Kambich also later told the Commission at a Commission meeting that he expected an additional six to eight students.

Francis Lorenz, a real estate appraiser, testified that the presence of the School has a negative impact on the values of the surrounding residences. The new building and the increase in students were incompatible with the surrounding residences and would decrease the value of the homes. The restrictions imposed by the amended special use ordinance were reasonably necessary to mitigate the harm caused by the new School building.

Robert Hamilton, a registered professional engineer, testified that, if 225 students attended the School, the accident potential would be $2^1/_2$ times greater. From a traffic safety point of view, 85 students were preferable. However, Hamilton stated that Lindgren's data were reliable and that there may be sufficient gaps in traffic to accommodate 225 students.

Gordon White, the Village engineer, testified that the plans for the

proposed new building stated that 80 students would be attending the School at any one time. Anthony Kambich told White that there would be 80 full-time students, but 125 was the total enrollment figure.

David Ritter and Gregory Wilson, Vernon Trails subdivision home-owners, testified that they bought their homes in 1989 and 1990, respectively, while the original farmhouse and flat-roofed building were on the School property. Ritter and Wilson stated that they relied on the nature of those buildings when they bought their homes and that they would not buy the homes today with the new school building on the site. Ritter and Wilson stated that Anthony told them at a subdivision meeting that there would only be an additional 8 or 9 students at the new building, bringing the total to 88 or 89, and the building would be a residential style, two-story building. Ritter stated that traffic congestion has greatly increased since the new School building was built. Cars often park on the shoulder of the road because the School parking lot cannot accommodate all of the cars.

Bruce Huvard, the assistant village attorney who drafted the amended special use ordinance, testified that he attended a Commission meeting. He understood that the old special use ordinance limited the use to the existing flat-roofed building and farmhouse. Huvard stated that on April 23, 1997, he told Abell, the attorney for the School, that the Kambiches were continuing construction of the new school building at their own risk because the amended special use ordinance issue had not yet been resolved. Abell told Huvard that no change in use of the property was to be made. During the Commission meetings, the Kambiches represented that they were simply substituting the new building for the old one and that the use would remain the same.

The Kambiches testified that, if the 120-student limitation were allowed to stand, the School would be forced to close and the situation would eventually lead to the closure of the other three Montessori schools. Sol Cohen, a certified public accountant, testified that, using projections provided by the Kambiches, an enrollment of 116 students would lead to an annual net loss of $262,305.

The trial court ruled in favor of the Village as to the estoppel claim alleged in count I. However, the trial court entered judgment in favor of the School on count II, finding the 120-student restriction arbitrary, unreasonable, and bearing no substantial relationship to the public health, safety, and welfare of the students. The court then amended the ordinance, increasing the daily attendance to 170 students instead of 120 students, and held the ordinance was to otherwise remain the same in all other respects.

The Village appeals from that portion of the order granting judgment in favor of the School and against the Village on count II and

that portion of the order amending ordinance No. 97—9—13 by increasing the daily attendance to 170 students. The School did not file a cross-appeal.

On appeal, the Village argues that the trial court's finding that the special use ordinance was invalid is against the weight of the evidence. The School argues that there was no basis for the 120-student limitation contained in the special use ordinance. We agree with the Village.

■ It is primarily the province of the municipal body and not the courts to determine the use and purpose to which property may be devoted. *New Lenox State Bank v. County of Will*, 205 Ill. App. 3d 457, 464 (1990). Therefore, zoning and special use ordinances are presumed valid. *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586, 594 (1999). A party challenging a zoning or special use ordinance bears the burden of proving by clear and convincing evidence that the application of the special use ordinance is arbitrary and unreasonable and bears no substantial relation to public health, safety, morals, or welfare. *City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 302 Ill. App. 3d 564, 571 (1998). We will not disturb a trial court's decision finding a zoning ordinance invalid unless it is against the manifest weight of the evidence. *State Bank v. City of Chicago*, 287 Ill. App. 3d 904, 912 (1997).

■ *La Salle National Bank v. County of Cook*, 12 Ill. 2d 40 (1957), set forth the following factors to be used in determining whether an ordinance is valid: (1) the existing uses in zoning of nearby property; (2) the extent to which property values are diminished by the restrictions; (3) the extent to which the ordinance promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owners; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned considered in the context of the land development in the area in the vicinity of the subject property. *La Salle National Bank*, 12 Ill. 2d at 46-47. *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370 (1960), provided two additional factors: the community's need for the proposed use and the care with which the community has undertaken to plan its land use development. *Sinclair*, 19 Ill. 2d at 378.

■ Our review of the record shows that the trial court was clearly erroneous in finding that the School proved by clear and convincing evidence that the amended special use ordinance limiting the number of students to 120 was invalid. Nearly every factor weighs in favor of the Village. Regarding the first factor, the nearby property is zoned for single-family residential use. Regarding the second factor, the

defendants presented overwhelming evidence that the property values of the nearby property would diminish. Regarding the third factor, the special ordinance promotes the safety and general welfare of the public by limiting the number of students, thus diminishing the traffic hazards and noise pollution. Regarding the fifth factor, the property at issue is suitable for a school with a limited number of students due to the surrounding property and traffic conditions. Regarding factor six, the property was not vacant before or after the amended special use ordinance was passed.

Regarding the fourth factor, the trial court found that the School would experience a hardship from the amended special use ordinance. This finding is erroneous. The evidence reveals that any hardship experienced by the School was self-imposed. Before the building was constructed, the School's property was subject to a special use ordinance that limited the property to its then-existing use: a 2,000-square-foot farmhouse with 22 students and a 2,500-square-foot flat-roofed building with 45 students. The School built the new building before the Village amended the special use ordinance. In fact, the Village's attorney warned the School to stop construction because the zoning issue had not been resolved. Thus, any hardship experienced by the plaintiffs was caused by their own actions and is therefore not relevant here. Further, it is well established that the monetary return that a party could receive from a different zoning does not establish hardship. *Oliver Construction Co. v. Villa Park*, 257 Ill. App. 3d 750, 755 (1994) (purchasers who acquire property with full knowledge of its zoning classification could not expect the loss in value resulting from the denial of the proposed use to be a persuasive argument in securing the change).

The two additional *Sinclair* factors (the community's need for the proposed use and the care with which the community had undertaken to plan its land use development) do not weigh in the School's favor because the School failed to present any evidence regarding these issues.

Accordingly, after reviewing the record, we determine that the School failed to sustain its burden of proof in proving that the special use ordinance was invalid. Thus, the trial court's finding that the amended special use ordinance was unreasonable is against the manifest weight of the evidence.

We also note that, even if the trial court had not erred in finding the amended special use ordinance invalid, its order amending the ordinance was improper. It is well settled that a court may not rezone property. *Treadway v. City of Rockford*, 24 Ill. 2d 488, 493 (1962); *Suhadolnik v. City of Springfield*, 184 Ill. App. 3d 155, 179-80 (1989).

Upon finding a zoning ordinance invalid, a trial court may either allow the plaintiff's proposed use or leave the property subject to its original zoning classification. *Treadway*, 24 Ill. 2d at 492; *Suhadolnik*, 184 Ill. App. 3d at 179-80. An exception to this rule applies when the court's decision leaves the property unzoned. *Sinclair*, 19 Ill. 2d at 378-79. However, in this case, the effect of the trial court's decision did not leave the property unzoned. Contrary to the School's claim, the property was subject to the original special use ordinance obtained by the School in 1986. This ordinance limited the property to its then-existing use. Thus, the trial court in this case misinterpreted *Sinclair* and erroneously amended special use ordinance No. 97—9—13 by increasing the limit of student enrollment to 170 from 120.

The judgment of the circuit court of Lake County is reversed.

Reversed.

BOWMAN, P.J., and COLWELL, J., concur.